**RONAN, TUZZIO & GIANNONE**
**4000 ROUTE 66**
**One Hovchild Plaza**
**Tinton Falls, NJ 07753**
**(732) 922-3300**
**Attorneys for Defendant, RIVERVIEW MEDICAL CENTER**
**Our File No. 155.8224 MANW/HPB**
**Henry P. Butehorn - (7147 HPB)**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **INES LOMANDO, as Administratrix Ad Prosequendum of the Estate of LAURA LOMANDO, deceased,** | **CIVIL CASE NO.: 3:08-CV-04177-FLW-TJB** |
| **Plaintiff(s)** | |
| **vs.** | **NOTICE OF MOTION FOR SUMMARY JUDGMENT** |
| **THE UNITED STATES OF AMERICA, STEPHANIE REYNOLDS, M.D., TREVOR TALBERT, M.D., DAVID HYPPOLITE, M.D., PARKER FAMILY HEALTH CENTER, RIVERVIEW MEDICAL CENTER, EMERGENCY PHYSICIAN ASSOCIATES NORTH JERSEY, PC, JOHN DOE #1 through #5, MARY MOE #1 through #5 (fictitious names representing unknown physicians, nurses, technicians, medical groups, medical facilities and/or other medical providers who participated in the medical care of the plaintiff)m, jointly, severally and in the alternative,** | |
| **Defendant(s)** | |

TO:   Anthony A. Lenza, Jr., Esq.
       Amabile & Erman, P.C.
       1000 South Avenue
       Staten Island, NY 10314-3407

       Martin J. McGreevy, L.L.C.
       Martin J. McGreevy, Esq.
       P. O. Box 820
       Oakhurst, NJ 07755

Sean Buckley, Esq.
Buckley & Theroux, LLC
932 State Road
Princeton, NJ 08540

James H. Moody, Esq.
Orlovsky, Moody, Schaaff & Gabrysiak
Monmouth Park Corporate Center
187 Highway 36
West Long Branch, NJ   07764

Kenneth M. Brown, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
33 Washington Street
Newark, NJ 07102

Karen Shelton, Esq.
United States Attorney
402 East State Street, Rm 430
Trenton, NJ 08608

COUNSEL:

PLEASE TAKE NOTICE that on Tuesday, July 6, 2010,  at 9:00 a.m. or as soon thereafter as counsel may be heard, the undersigned attorneys for defendant, Riverview Medical Center, shall move before the United States District Court for the District of New Jersey for an Order for Summary Judgment.

In support of the within application, the undersigned shall rely upon the attached Certification of Counsel, Exhibits and Brief.

Oral argument is waived, unless timely opposition is filed.  In the event opposition is entered to this motion, defendants request that this matter be set down for oral argument.

A proposed form of Order is annexed hereto in accordance with R. 1:6-2.

## **CERTIFICATION**

We hereby certify that the original and two copies of the within Motion and supporting papers were timely filed with the Motions Clerk of the United States District Court, District of New Jersey, Clarkson S. Fisher Federal Bldg. & U.S. Courthouse, 402 E. State Street, Room 6052, Trenton, NJ  08608  We further certify that a copy of the within Motion and supporting papers were served upon all counsel of record on the date indicated below.

RONAN, TUZZIO & GIANNONE
ATTORNEYS FOR DEFENDANT,
RIVERVIEW MEDICAL CENTER


BY:_____

DATED: June     4  , 2010           HENRY P. BUTEHORN

**RONAN, TUZZIO & GIANNONE**
**4000 ROUTE 66**
**One Hovchild Plaza**
**Tinton Falls, NJ 07753**
**(732) 922-3300**
**Attorneys for Defendant, RIVERVIEW MEDICAL CENTER**
**Our File No. 155.8224 MANW/HPB**
**Henry P. Butehorn - (7147 HPB)**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **INES LOMANDO, as Administratrix Ad Prosequendum of the Estate of LAURA LOMANDO, deceased,** | **CIVIL CASE NO.: 3:08-CV-04177-FLW-TJB** |
| **Plaintiff(s)** | **CERTIFICATION OF COUNSEL** |
| **vs.** | |
| **THE UNITED STATES OF AMERICA, STEPHANIE REYNOLDS, M.D., TREVOR TALBERT, M.D., DAVID HYPPOLITE, M.D., PARKER FAMILY HEALTH CENTER, RIVERVIEW MEDICAL CENTER, EMERGENCY PHYSICIAN ASSOCIATES NORTH JERSEY, PC, JOHN DOE #1 through #5, MARY MOE #1 through #5 (fictitious names representing unknown physicians, nurses, technicians, medical groups, medical facilities and/or other medical providers who participated in the medical care of the plaintiff)m, jointly, severally and in the alternative,** | |
| **Defendant(s)** | |

I, TIL J. DALLAVALLE, Esq., hereby certify as follows:

1.      I am Attorney at Law of the State of New Jersey and an Associate of the firm of
Ronan Tuzzio & Giannone, attorneys for defendant, RIVERVIEW MEDICAL
CENTER.  In this capacity, I am fully familiar with the facts set forth herein.

2.      I make this Certification in support of defendant, RIVERVIEW MEDICAL CENTER'S
Motion for Summary Judgment.

3.     This is a medical malpractice case arising out of the treatment provided to Laura Lomando during her three (3) admissions to Riverview Medical Center beginning on September 3, 2006.   Plaintiffs allege defendants, including Riverview Medical Center, failed to diagnose and timely treat non-Hodgkins lymphoma which caused injury and the subsequent death of plaintiff, Laura Lomando. (See Complaint attached as **Exhibit A**).

4.     Pursuant to the April 13, 2010 Case Management Order signed by Magistrate Judge Lois Goodman, plaintiff was required to serve all expert reports on or before May 31, 2010.  (See Order attached as **Exhibit B**).

5.     Plaintiff has served the Report of Mark A. Fialk, M.D., dated May 10, 2010. (See report attached as **Exhibit C**).

6.     This report does not offer any criticisms against defendant, RIVERVIEW MEDICAL CENTER.

7.     To date, plaintiff has not served a qualified expert against defendant, RIVERVIEW MEDICAL CENTER.

8.     No motion to extend discovery has been filed with the Court.

9.     No request for additional time to serve expert reports has been made to any of the parties.

10.    Consequently, Plaintiff cannot establish a *prima facie* case against defendant, RIVERVIEW MEDICAL CENTER. Accordingly, summary judgment is warranted as a matter of law.

11.    Based on the foregoing, summary judgment should be granted as to defendant, RIVERVIEW MEDICAL CENTER.

I certify that the foregoing statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

RONAN, TUZZIO & GIANNONE
ATTORNEYS FOR DEFENDANT,
RIVERVIEW MEDICAL CENTER

BY:_____
　　　　　TIL J. DALLAVALLE

DATED: June _____, 2010

| | |
|---|---|
| INES LOMANDO, as Administratrix Ad Prosequendum of the Estate of LAURA LOMANDO, deceased, | CIVIL CASE NO.: 3:08-CV-04177-FLW-TJB |

Plaintiff(s)

vs.

THE UNITED STATES OF AMERICA, STEPHANIE REYNOLDS, M.D., TREVOR TALBERT, M.D., DAVID HYPPOLITE, M.D., PARKER FAMILY HEALTH CENTER, RIVERVIEW MEDICAL CENTER, EMERGENCY PHYSICIAN ASSOCIATES NORTH JERSEY, PC, JOHN DOE #1 through #5, MARY MOE #1 through #5 (fictitious names representing unknown physicians, nurses, technicians, medical groups, medical facilities and/or other medical providers who participated in the medical care of the plaintiff)m, jointly, severally and in the alternative,

Defendant(s)

---

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN FAVOR OF DEFENDANT, RIVERVIEW MEDICAL CENTER

---

RONAN, TUZZIO & GIANNONE
4000 ROUTE 66
One Hovchild Plaza
Tinton Falls, NJ 07753
(732)922-3300
Attorneys for Defendants,
RIVERVIEW MEDICAL CENTER,

Of Counsel: Mary Ann Nobile Wilderotter, Esq.

On the Brief: Henry P. Butehorn, Esq.
                    Til J. Dallavalle, Esq.

## STATEMENT OF MATERIAL FACTS

1.    This is a medical malpractice case arising out of the treatment provided to Laura Lomando in 2006, including her three (3) admissions to Riverview Medical Center beginning on September 3, 2006.  Plaintiffs allege defendants, including Riverview Medical Center, failed to diagnose and timely treat non-Hodgkins lymphoma which caused injury and the subsequent death of plaintiff, Laura Lomando. (See Complaint attached as **Exhibit A**).

2.    By way of background, plaintiff, Laura Lomando, came under the care of Zaven Ayanian, M.D. on August 23, 2006 for evaluation of left sided neck swelling/enlargement.  (See Report of Mark A. Fialk, M.D., dated May 10, 2010, attached as **Exhibit C**). On August 26, 2006, Ms. Lomando presented to Diana Helmer, M.D. for evaluation and treatment of similar complaints. (Id.).

3.    The differential diagnosis at that time was submental lymph adonitis versus submental salivary duct obstruction and plaintiff was given a prescription for amoxycillin. (Id.).

4.    On September 3, 2006 plaintiff presented to Riverview Medical Center asserting continued complaints in the foregoing regard. (Id.).

5.    She indicated her history of swollen glands and that she had seen an oral surgeon (as well as her primary physician) over that time period. (Id.).

6.    The physician's examination indicated swollen glands and recounted her history of treatment for same.  (See Report of Mark A. Fialk, M.D., dated May 10, 2010, attached as **Exhibit C**).

7.    The record goes on to indicate she was diagnosed with acute left parotiditis, given

a prescription for Motrin, and was referred to follow up with an ENT. (Id.)

8.  Two (2) days later plaintiff returned to the Hospital with new complaints of shortness of breath and chest pain; there was also an "increase in symptoms" since her last visit.  (See Report of Mark A. Fialk, M.D., dated May 10, 2010, attached as **Exhibit C**).

9.  The examination on this date revealed chest tightness, but same was associated with the institution of medication. (Id.).

10. As such, she was diagnosed with a medication reaction, told to stop the medication, and referred to her primary physician. (Id.).

11. Over the next week plaintiff followed with her primary doctor at the Parker Family Health Center. (Id.)

12. Plaintiff returned to Riverview on September 15, 2006 with a one (1) week history of malaise, body aches, and headache. (Id.).

13. An EKG on this date was normal, blood cultures were negative, and plaintiff was discharged. (See Report of Mark A. Fialk, M.D., dated May 10, 2010, attached as **Exhibit C**).

14. The plaintiff was eventually admitted to Riverview through the emergency department on September 20, 2006. (Id.).

15. She presented with a complaint of deterioration from her visit five (5) days prior; she was admitted to the ICU and underwent various tests and consultations. (Id.).  A CT of the neck identified multiple areas of adenopathy and the primary diagnosis to be considered was noted to be lymphoma. (Id.).

16. The day after admission the plaintiff coded twice, and after approximately two (2)

hours of attempted resuscitation she was pronounced by the physicians. (See Report of Mark A. Fialk, M.D., dated May 10, 2010, attached as **Exhibit C**).  The ultimate cause of death, as identified on the post mortem, was non Hodgkin's lymphoma. (Id.).

17. Pursuant to the April 13, 2010 Case Management Order signed by Magistrate Judge Lois Goodman, plaintiff was required to serve all expert reports on or before May 31, 2010.  (See Order attached as **Exhibit B**).

18. Plaintiff has served the Report of Mark A. Fialk, M.D., dated May 10, 2010. (See report attached as **Exhibit C**).

19. This report does not offer any criticisms against defendant, RIVERVIEW MEDICAL CENTER.

20. To date, plaintiff has not served a qualified expert against defendant, RIVERVIEW MEDICAL CENTER.

21. No motion to extend discovery has been filed with the Court.

22. No request for additional time to serve expert reports has been made to any of the parties.

23. Pursuant to the April 13, 2010 Case Management Order signed by Magistrate Judge Lois Goodman, the time within which plaintiff may serve an expert report has expired.  (See Order attached as **Exhibit B**).

24. Consequently, Plaintiff cannot establish a *prima facie* case against defendant, RIVERVIEW MEDICAL CENTER. Accordingly, summary judgment is warranted as a matter of law.

## LEGAL ARGUMENT

### POINT I

**INSOFAR AS PLAINTIFF HAS FAILED TO PROVIDE THE
REQUISITE EXPERT TESTIMONY AS TO DEFENDANT,
SUMMARY JUDGMENT IS  WARRANTED AS A MATTER OF LAW**

It is well-established in New Jersey that the general standard of care a medical provider is required to have and exercise in the diagnosis and treatment of a patient is that degree of care, skill, and knowledge that is ordinarily possessed by an average health care facility under similar circumstances.  Walck v. John's-Manville Products Corporation, 56 N.J. 533 (1970); German v. Matriss, 55 N.J. 193 (1970); Jones v. Stess, 111 N.J. Super. 283 (App. Div. 1970).

Plaintiffs in a medical malpractice case, as in all other cases, bear the burden of proof by the preponderance of the evidence that the defendant hospital was negligent. Evidence of mere mistake or error does not suffice.  See Walck, supra, 56 N.J. Super. at 562.

Since medical malpractice actions involve sophisticated technical issues of medical fact and opinion transcending the common knowledge of even intelligent laity, plaintiffs must produce expert testimony establishing (1) the standard of care applicable to the defendant, (2) deviation from that standard of care, and (3) that the deviation proximately caused the alleged injury. Gardner v. Pawliw, 150 N.J. 359, 375 (1997). This general rule is summarized well in Toy v. Rickert, 53 N.J. Super. 27 (App. Div. 1958), where the Appellate Division stated, the

> ...failure to use the requisite degree of professional skill demanded of the physician or surgeon must ordinarily be established by the expert testimony of those qualified by their own knowledge and experience in the same profession to know and state whether in given circumstances on any particular case that the physician or surgeon had failed to exercise that

degree of knowledge and skill which usually pertains to other members of his profession.

Id. at 32.

The policy behind the requirement of expert testimony is well-settled. If the jury were required to decide matters which transcended its knowledge and experience, its decisions inevitably would be arbitrary. To burden hospitals and doctors with arbitrary decisions regarding their liability for malpractice would be grossly unfair. Medicine is an inexact science, and doctors and hospitals must be granted a reasonable range of judgment within which there is no liability. Justice Francis summarized this point in Schueler v. Strelinger, 43 N.J. 330 (1964), when he stated:

> The law recognizes that medicine is not an exact science...a physician must be allowed a wide range and a reasonable exercise of judgment. He is not guilty of malpractice so long as he employs such judgment, and that judgment does not represent departure from the requirements of accepted medical practice, not in failure to do something excepted medical practice obligates him to do, or in the doing of something, he should not do measured by the standard above stated...With rare exceptions, evidence of a deviation from accepted medical standards must be provided by confident and qualified physicians. Ordinarily a jury of laymen cannot be allowed to speculate as to whether the procedure followed by a treatment physician conforms to required professional standards.

Schueler, supra, 43 N.J. at 344-5 (citations omitted).

Moreover, the New Jersey Supreme Court, in Germann, supra, further explained that a plaintiff who charges a deviation from such standard of skill or care must assume the burden of establishing facts showing not only the deviation but also a fact equally essential to recovery of damages, i.e., that the deviation was the reasonably probable cause of the injurious condition arising thereafter. Germann, supra, 55 N.J. at 208.

In the case at bar, Plaintiffs allege defendants, including Riverview Medical Center, failed to diagnose and timely treat non-Hodgkins lymphoma which caused injury and the

subsequent death of plaintiff, Laura Lomando. Plaintiff has served the Report of Mark A. Fialk, M.D., dated May 10, 2010. (See report attached as **Exhibit C**).  This report does not offer any criticisms against defendant, Riverview Medical Center.

The time in which plaintiff was afforded to serve expert reports, pursuant to the Court's April 13, 2010 case management order, expired on May 31, 2010. (See **Exhibit B**). Plaintiff failed to file a motion for additional time or request additional time from counsel to serve expert reports.  Therefore, plaintiff cannot serve a report necessary to establish a claim against Riverview Medical Center.

Plaintiff has failed to offer any expert testimony to establish at trial, (1) how the defendant, Riverview Medical Center, allegedly deviated from the applicable standards of care and (2) that the alleged malpractice was the proximate cause of the injuries allegedly sustained. Consequently, Plaintiff cannot establish a *prima facie* case against said defendant.   It is therefore respectfully requested that defendant, Riverview Medical Center's Motion for Summary Judgment be granted, dismissing Plaintiff's Complaint and all cross-claims against said Defendant, with prejudice, as a matter of law.

## POINT II

### THIS MATTER IS RIPE FOR SUMMARY JUDGMENT

Pursuant to R. 4:46, if there is no issue of material fact, the moving party is entitled to Summary Judgment as a matter of law.  This procedure is designed to provide a prompt, businesslike, and inexpensive method of disposing of any cause, which a discriminating search of the merits and the pleadings, depositions and admissions on file, together with the affidavit submitted on the motion, clearly show not to present any genuine issue of material fact requiring disposition at trial. Judson v. People's Bank & Trust Co. of Westfield,

17 N.J. 67, 74 (1954).  The standards in determining whether a summary judgment motion should be granted was set forth by Justice Brennan in Judson:

> The standards of decision governing the grant or denial of a summary judgment emphasize that a part opposing a motion is not being denied a trial unless the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact.  At the same time, the standards are to be applied with a discriminating care so as not to defeat a summary judgment if the movant is justly entitled to one.

Judson, supra, 17 N.J. at 74; see also, Maher v. New Jersey Transit R.O., 125 N.J. 455 (1991), Shanley and Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 211 (App. Div. 1987).

Moreover, the New Jersey Supreme Court in Brill v. The Guardian Life Insurance Co. of America, 142 N.J. 520 (1995) held:

> Under R. 4:46-2, when deciding Summary Judgment Motions, trial courts are required to engage in the same type of evaluation analysis or sifting of evidential materials as required by R. 4:37-2(b) in light of the burden of persuasion that applies if the matter goes to trial. ...Under this new standard, a determination whether there exists 'genuine issue' of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact-finder to resolve the alleged disputed issue in favor of the non-moving party.

Id. at 540.

The Brill Court also noted that "a non-moving party cannot defeat a Motion for Summary Judgment merely by pointing to *any* fact in dispute." Id. at 529. (emphasis supplied).  The Court in *Brill* asserted that "under our holding today, the essence of the inquiry in each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that only party must prevail as a matter of law." Id., 142 N.J. at 536, quoting, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 252 (1986).

Furthermore, for purposes of R. 4:46-2, an alleged disputed issue of fact should be considered insufficient to constitute a "genuine" issue of material fact, if there exists a "single, unavoidable resolution" of such issue of fact. Id. at 540, quoting, Liberty Lobby, Inc., supra., 477 U.S. at 250 (1986).

The Brill Court concerned with the efficiency of the Courts, stated that "to send a case to trial knowing that a rationale jury can reach but one conclusion, is indeed 'worthless' and will 'serve no useful purpose.'" Id., 142 N.J. at 541. The New Jersey Supreme Court also emphasized in the Brill decision that "the thrust of today's decision is to encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves." Id.

Insofar as plaintiff has not produced the requisite expert testimony against defendant, RIVERVIEW MEDICAL CENTER, there exists no issue of material fact, and, therefore, summary judgment is warranted as a matter of law.

## CONCLUSION

Based on the foregoing, the Court should grant the Motion in favor of defendant, RIVERVIEW MEDICAL CENTER, and dismiss the Complaint and all cross-claims as to said defendant, with prejudice.

RONAN, TUZZIO & GIANNONE
ATTORNEYS FOR DEFENDANT,
RIVERVIEW MEDICAL CENTER

BY:_____
HENRY P. BUTEHORN

DATED: June   4   , 2010

# EXHIBIT A

P-588
Anthony A. Lenza, Jr., Esq.
Law Office of Carl M. Erman, Esq.
618 Newark Avenue
Elizabeth, NJ 07028
alenza@amabile-erman.com
(908) 282-0505
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEW JERSEY

-----------------------------------X
INES LOMANDO, as Administratrix Ad
Prosequendum of the Estate of   CIVIL NO.
LAURA LOMANDO, deceased,

     Plaintiff,

  -against-

THE UNITED STATES OF AMERICA.

     Defendant.
-----------------------------------X

## COMPLAINT

  Plaintiff, INES LOMANDO, as Administratrix Ad
Prosequendum of the Estate of LAURA LOMANDO, deceased, residing at
366 Daniel Drive, Town of Ocean, City of Asbury Park, County of
Monmouth, and State of New Jersey, complaining of the defendant
says:

## FIRST COUNT

  1. This action arises under the Federal Tort Claims Act, 28
U.S.C. §§2671 et seq., and this Court has jurisdiction under the
provisions of 28 U.S.C. §1346(b).

  2. At all times herein mentioned, ZAVEN AYANIAN, M.D., DIANA
HELMER, M.D., and other physicians whose identities are not

currently known were volunteer free clinic health professionals practicing medicine at the Parker Family Health Center in Red Bank, NJ.

3. At all times herein mentioned, ZAVEN AYANIAN, M.D., DIANA HELMER, M.D., other physicians whose identities are not currently known are deemed federal employees for purposes of the Federal Tort Claims Act.

4. On August 23, 2006, plaintiff's decedent, LAURA LOMANDO, came under the medical care of ZAVEN AYANIAN, M.D. at the Parker Family Health Center for the evaluation and treatment of left sided neck swelling/enlargement.

5. On August 28, 2006, plaintiff's decedent, LAURA LOMANDO, came under the medical care of DIANA HELMER, M.D. at the Parker Family Health Center for the evaluation and treatment of left sided neck swelling/enlargement.

6. On September 9, 2006, plaintiff's decedent, LAURA LOMANDO, came under the medical care of a volunteer free clinic health professional and physician whose identity is currently unknown at the Parker Family Health Center for the evaluation and treatment of fatigue, left sided neck swelling/enlargement, and positive right axillary node.

7. On September 11, 2006, plaintiff's decedent, LAURA LOMANDO, came under the medical care of a volunteer free clinic health professional and physician whose identity is currently unknown at the Parker Family Health Center for the evaluation and

2

treatment of fatigue, left sided neck swelling/enlargement, and positive right axillary node.

8. On September 21, 2006, plaintiff's decedent, LAURA LOMANDO, died while admitted at Riverview Medical Center in Red Bank, NJ.

9. At all times herein relevant, ZAVEN AYANIAN, M.D. was a licensed and practicing physician in the State of New Jersey holding himself out to the public as a specialist in the field of internal medicine. As such, DR. AYANIAN is and was to be held to a higher standard of care than the general practitioner within his chosen specialty.

10. At all times herein relevant, DIANA HELMER, M.D., was a licensed and practicing physician in the State of New Jersey holding herself out to the public as a specialist in the field of internal medicine. As such, DR. HELMER is and was to be held to a higher standard of care than the general practitioner within her chosen specialty.

11. Plaintiff charges that the named and unnamed volunteer free clinic health professionals and physicians owed a duty to the plaintiff's decedent, LAURA LOMANDO, to render medical care in conformity with accepted standards of medical practice and deviated from good and accepted standards and breached their duty owing to the plaintiff's decedent, LAURA LOMANDO, which breach was a proximate cause of LAURA LOMANDO's injuries, pain and suffering, mental anguish, and ultimate death on September 21, 2006.

3

12. As a result of the carelessness, recklessness and negligence as well as the failure to adhere to accepted medical standards by defendant's deemed employees or agents, LAURA LOMANDO suffered severe and painful permanent injuries and subsequently died on September 21, 2006 because of those injuries.

13. On February 13, 2008, plaintiff submitted her claim for a definite amount to the United States Department of Health & Human Services, Public Health Service Claims Office. By August 14, 2008, the United States Department of Health & Human Services, Public Health Service had neither accepted nor rejected such claim and, pursuant to 28 U.S.C. §2675(a), plaintiff has elected to consider such failure to act as a final denial of the claim.


## SECOND COUNT


1. Plaintiff repeat herein and incorporate by reference each and every allegation of the FIRST COUNT as if set forth more specifically in its entirety.

2. Plaintiff charges that the defendant's named and unnamed volunteer free clinic health professionals and physicians deviated from good and accepted standards of the medical profession in failing to properly advise plaintiff's decedent of the risks associated with delaying the procedures, tests, and treatments which they intended to perform upon her and the complications attendant thereto and, therefore, defendants have violated the

4

doctrine commonly known as "informed consent".

3.   As a result of defendants' negligence as aforesaid, plaintiff's decedent, LAURA LOMANDO, sustained severe harm, loss, injury and eventual death.


## THIRD COUNT


1.   Plaintiff repeats herein and incorporates by reference each and every allegation of the FIRST and SECOND COUNTS as if set forth more specifically in its entirety.

2.   On or about September 12, 2007, the plaintiff, INES LOMANDO, was appointed Administratrix Ad Prosequendum of the Estate of LAURA LOMANDO by the Surrogate Court of Monmouth, State of New Jersey and she was duly qualified and is still acting as such Administratrix.

3.   Plaintiff charges that as a direct and proximate result of the carelessness, recklessness and negligence of the defendant's named and unnamed volunteer free clinic health professionals and physicians, as well as the failure to adhere to accepted medical standards, plaintiff's decedent, LAURA LOMANDO, died on September 21, 2006.

4.   That this action is commenced within two (2) years of the death of LAURA LOMANDO.

5.   That the heirs-at-law of LAURA LOMANDO have sustained damages as a result of the death of LAURA LOMANDO.

5

6.     There is, and there was at the time of the events complained of, in force and effect in the State of New Jersey, a death statute known and designed as N.J.S.A. 2A:31-1, et seq., and plaintiff brings the fourth count of this action pursuant to the provisions thereof for the benefit of the next of kin of plaintiff's decedent and within two (2) calendar years of the date on which the cause of action accrued.

WHEREFORE, the plaintiff demands judgment against the United States of America as follows:

1.     Award compensatory damages on the First Count in an amount to be determined at trial;

2.     Award compensatory damages on the Second Count in an amount to be determined at trial;

3.     Award compensatory damages on the Third Count in an amount to be determined at trial;

4.     Award costs of this action to the plaintiff;

5.     Such other relief as the Court may deem proper.

Dated:     August 15, 2008

CARL M. ERMAN, ESQ.
Attorney for Plaintiff


ANTHONY A. LENZA, JR. (AL2680)
ALENZA@AMABILE-ERMAN.COM

6

## JURY DEMAND

Plaintiff hereby demands trial by jury.

Dated:      August 15, 2008

                              CARL M. ERMAN, ESQ.
                              Attorney for Plaintiff


                              ANTHONY A. LENZA, JR. (AL2680)
                              ALENZA@AMABILE-ERMAN.COM

## CERTIFICATION PURSUANT TO CIV. RULE 11.2

The undersigned certifies that the within matters in controversy are related to a pending matter in Superior Court of the State of New Jersey with the following caption:

```
-------------------------------------X
INES LOMANDO, as Administratrix Ad
Prosequendum of the Estate of            SUPERIOR COURT OF NEW JERSEY
LAURA LOMANDO, deceased,                 LAW DIVISION-MONMOUTH COUNTY

                                         DOCKET NO. MON-L-4802-07

             Plaintiff,
                                             CIVIL ACTION

        -against-
                                         MEDICAL MALPRACTICE

STEPHANIE REYNOLDS, M.D., TREVOR
TALBERT, M.D., DAVID HYPPOLITE
M.D., PARKER FAMILY HEALTH CENTER,
RIVERVIEW MEDICAL CENTER, EMERGENCY
PHYSICIAN ASSOCIATES NORTH JERSEY, PC,
JOHN DOE #1 through #5, MARY MOE #1 through
#5, and XYZ CORPORATION #1 through
#5 (fictitious names representing
unknown physicians, nurses,
technicians, medical groups, medical
facilities and/or other medical
providers who participated in the
medical care of the plaintiff) jointly,
severally and in the alternative,

             Defendants.
-------------------------------------X
```

7

Said state court action initially included ZAVEN AYANIAN, M.D. and DIANA HELMER, M.D. as named defendants until the undersigned was notified that said physicians were deemed federal employees under the Federal Tort Claims Act. Thereafter, said defendant physicians were discontinued from the pending New Jersey Superior Court action so that the instant action could be commenced. It is requested that the New Jersey Superior Court action be transferred and consolidated into the instant action.

Dated:     August 15, 2008

                                    CARL M. ERMAN, ESQ.
                                    Attorney for Plaintiff


                                    ANTHONY A. LENZA, JR. (AL2680)
                                    ALENZA@AMABILE-ERMAN.COM

8

# EXHIBIT B

JAN-08-2010  12:52PM   FROM-

T-446   P.002/003   F-786

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------X
INES LOMANDO, as Administratrix Ad
Prosequendum of the Estate of
LAURA LOMANDO, deceased,                    CIVIL NO. 3:08-CV-04177-FLW-TJB

                          Plaintiff,

          -against-

THE UNITED STATES OF AMERICA,
STEPHANIE REYNOLDS, M.D., TREVOR
TALBERT, M.D., DAVID HYPPOLITE,
M.D., PARKER FAMILY HEALTH CENTER,
RIVERVIEW MEDICAL CENTER, EMERGENCY
PHYSICIAN ASSOCIATES NORTH JERSEY, PC,
JOHN DOE #1 through #5, MARY MOE #1 through          **SCHEDULING ORDER**
#5, and XYZ CORPORATION #1 through
#5 (fictitious names representing
unknown physicians, nurses,
technicians, medical groups, medical
facilities and/or other medical
providers who participated in the
medical care of the plaintiff) jointly,
severally and in the alternative,

                          Defendants.
-----------------------------------X
     This matter having come before the Court during a telephonic
conference on January 8, 2010 with all parties being present, and
the Court having considered the positions of the parties, and good
cause having been shown,

        It is on this 8th day of January 2010,

        ORDERED that:

        1. Fact discovery is to be completed by March 31, 2010;

        2. Plaintiff shall serve expert reports by May 31, 2010;

        3. Defendants shall serve expert reports by July 30, 2010;

        4. Expert depositions shall be completed by November 1, 2010;

JAN-08-2010 12:53PM  FROM-

T-446  P.003/003  F-786

5. A telephone conference will take place on April 13, 2010 at 9:30AM to schedule a settlement conference.

HONORABLE LOIS H. GOODMAN
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**CHAMBERS OF**
**LOIS H. GOODMAN**
**UNITED STATES MAGISTRATE JUDGE**

**CLARKSON S. FISHER U.S. COURTHOUSE**
**402 EAST STATE STREET**
**ROOM 7050**
**TRENTON, NJ 08608**
**609-989-2114**

April 13, 2010

## LETTER ORDER

Re:     **LOMANDO v. UNITED STATES, et al.**
         **Civil Action No. 08-4177  (FLW)**

Dear Counsel:

        The Court will conduct a settlement conference on **September 2, 2010 at 10 a.m.** Parties with full authority to settle are to be present in person. Any failure in this regard may subject the party to an imposition of sanctions.

        **Five days** before the conference, each party is to submit an ex parte statement of five pages or less, setting forth the issues relevant to settlement and the party's position as to settlement. No less than **20 days** before the settlement conference, Plaintiff is to serve a settlement demand on Defendants.

        In addition, any party desiring to file a dispositive motion may do so by no later than **June 11, 2010,** such that the motion is returnable on **July 6, 2010.**

        **IT IS SO ORDERED.**

**LOIS H. GOODMAN**
**United States Magistrate Judge**

# EXHIBIT C

P-588
Anthony A. Lenza, Jr., Esq.
Law Office of Carl M. Erman, Esq.
618 Newark Avenue
Elizabeth, NJ 07028
alenza@amabile-erman.com
(908) 282-0505
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEW JERSEY

-----------------------------------X

INES LOMANDO, as Administratrix Ad
Prosequendum of the Estate of       CIVIL NO. 3:08-CV-04177-FLW-TJB
LAURA LOMANDO, deceased,

                    Plaintiff,

        -against-                   **EXPERT WITNESS DISCLOSURE**
                                    **FOR MARK A. FIALK, M.D.**

THE UNITED STATES OF AMERICA,
STEPHANIE REYNOLDS, M.D., TREVOR
TALBERT, M.D., DAVID HYPPOLITE,
M.D., PARKER FAMILY HEALTH CENTER,
RIVERVIEW MEDICAL CENTER, EMERGENCY
PHYSICIAN ASSOCIATES NORTH JERSEY, PC,
JOHN DOE #1 through #5, MARY MOE #1 through
#5, and XYZ CORPORATION #1 through
#5 (fictitious names representing
unknown physicians, nurses,
technicians, medical groups, medical
facilities and/or other medical
providers who participated in the
medical care of the plaintiff) jointly,
severally and in the alternative,

                    Defendants.
-----------------------------------X

TO:  Martin J. McGreevy, LLC
     Attn: Teresa Gierla, Esq.
     1 Industrial Way West
     West Ridge, Building A
     Eatontown, NJ 07724
     Attorneys for Defendant(s)
     DAVID HYPPOLITE, M.D.

Ronan, Tuzzio & Giannone
Attn: Henry Butehorn, Esq.
4000 Route 66
Tinton Falls, NJ 07753-7308
Attorneys for Defendant(s)
RIVERVIEW MEDICAL CENTER

United States Attorney
Attn: Karen Shelton, Esq.
402 East State Street, Room 430
Trenton, NJ 08608
Attorneys for Defendant(s)
THE UNITED STATES OF AMERICA

Orlovsky, Moody, Schaaf & Gabrysiak
Attn: James Moody, Esq.
187 Highway 36
West Long Branch, NJ 07764
Attorneys for Defendant(s)
PARKER FAMILY HEALTH CENTER

Buckley & Theroux, LLC
Attn: Brian Burlew, Esq.
932 State Road
Princeton, NJ 08540
Attorneys for Defendant(s)
STEPHANIE REYNOLDS, M.D., TREVOR
TALBERT, M.D., and EMERGENCY
PHYSICIAN ASSOCIATES NORTH JERSEY, PC


PLEASE TAKE NOTICE that plaintiff hereby provides the
following information pursuant to FRCP Rule 26(a)(2)(B):

   1.   Mark A. Fialk, M.D. has been retained as an expert
        in the fields of internal medicine, hematology and
        oncology.

   2.   A copy of Dr. Fialk's expert report is attached
        hereto.

   3.   A copy of Dr. Fialk's CV which includes
        publications is attached hereto.

2

4.   A copy of Dr. Fialk's trial testimony history is attached hereto.

5.   Dr. Fialk has charged $10,110 for review and preparation of his report.  He charges $350/hour.

Dated: May 20, 2010

                              CARL M. ERMAN, ESQ.
                              Attorney for Plaintiff


                              _____
                              ANTHONY A. LENZA, JR. (AL2680)
                              ALENZA@AMABILE-ERMAN.COM

3



**Mark Fialk, M.D., PC**
**259 Heathcote Road**
**Scarsdale, New York 10583**

May 10, 2010

Mr. Anthony A. Lenza
Amabile & Erman
1000 South Avenue
Staten Island, NY 10314-3407

RE: Lomando v. USA et.al.

Dear Mr. Lenza,

In the above matter, you have submitted to me the following materials and I am hereby summarizing the medical course and stating my opinions as to whether standards of care were met in the treatment rendered to Laura Lomando.

1. Medical records of Riverview Medical Center, 9/3/2006.
2. Medical records of Riverview Medical Center, 9/5/2006
3. Medical records of Riverview Medical Center, 9/15/2006
4. Medical records of Riverview Medical Center, 9/20/2006.
5. Medical records, Emergency Medical Services, Middletown Township.
6. Deposition testimony Dr. Haig Minassian.
7. Deposition testimony Mary Nicosia.
8. Deposition testimony Dr. Timothy Sullivan.
9. Deposition testimony Dr. Helmer.
10. Deposition testimony Dr. Zaben Ayanian.
11. Deposition testimony Dr. Trevor Talbert
12. Deposition testimony Physician's Assistant, Mr. Biedenbach.
13. Deposition testimony Dr. Stephanie Reynolds.
14. Deposition testimony Dr. David Hyppolite.
15. Deposition testimony Ines Lomando.
16. Medical records of Riverview Medical Center, Outpatient Department.
17. Dental records, Dr. Peterson.
18. Medical records Lincroft Oral and Maxillofacial Surgery.
19. Medical records of The Parker Family Health Center.
20. Autopsy report, Office of the Medical Examiner, County of Monmouth.
21. CAT scan images of neck and chest 9/20/2006.

Laura Lomando presented herself on July 24, 2006 to the Parker Family Health Center for a complete physical examination. Other than depression, there were no complaints. The examination was normal and the diagnosis was exogenous obesity and depression. Prior laboratory records indicated that on June 6, 2003, a complete blood count, chemical profile and TSH test were normal. On July 24, 2006, Dr. Roger Thompson of the Family Practice of Middletown filled out a form and reported to the Parker Clinic that the patient had a history of hypothyroidism and obesity and was on Levoxyl 0.05 mcg. On August 19, 2006, laboratory data

Page 2.
Laura Lomando

from the Riverview Medical Center revealed a normal chemical profile, normal TSH, and normal lipid profile. The free T4 was slightly low at 0.73.

On August 23, 2006, the patient was seen by Dr. Ayanian. The chief complaint was swollen glands x 1 day, left side. Her weight was 192 lb, temperature of 98.2, pulse 68, respiratory rate 18 and blood pressure 130/69. Dr. Ayanian wrote "awakened with painful and tender left submental solitary lymphadenopathy. Denies awareness of any sores in oral cavity, but does say she noted some sensitivity in the left lower teeth (poorly localized)". Physical examination revealed, ENT – unremarkable, mouth- unremarkable, including percussion of teeth and neck negative. The impression was 1) left submental lymphadenitis vs. submental salivary duct obstruction. The treatment was Amoxicillin 500 mg t.i.d., and lemon sour balls.

On August 28, 2006, the patient re-presented to the Parker Family Health Clinic with a chief complaint of "swollen gland left side neck". The patient was seen by Dr. Helmer who wrote "seen last week for same problem, not better". Dr. Helmer noted that there was no sore throat, no dental pain, although the patient had not been seen for 6-7 years. There was tender left submandibular "? node". ENT negative, otherwise no obvious dental abscess. No cervical (anterior or posterior) adenopathy. The impression was submental node, question etiology, could be salivary gland stone. The recommendation was push fluids, finish Amoxicillin. Dr. Helmer recommended a return visit in two weeks and if not resolved, consider a dental/ENT evaluation. Additionally, the patient was recommended to return sooner if worse. It was recommended that the patient return on September 11, 2006. At the time of the August 28, 2006 visit, the weight was 198, temperature 98.3, pulse 78, respiratory rate 18 and blood pressure of 104/67. In deposition testimony, Dr. Helmer stated that the size of the lymph node was 0.5 to 1 cm or the size of a thumb nail. He additionally stated that at the current visit he felt that the patient was not better and not worse.

On August 30, 2006, the patient was seen by Dr. Peterson for a dental evaluation. It is noted that the patient has had swelling left side for about one week and has been on antibiotics for 7 days (medical doctor). Glands ?, swollen wisdom teeth ?, salivary duct ?, hurts now when she yawns or eats; teeth hurt now as well. On scale of 1-10, the pain is 7. Panorex x-ray was taken and the patient was given a copy to take to Dr. Fratelleone and also a prescription for Tylenol No. 3.

On August 31, 2006, the patient was seen at the Lincroft Oral Maxillofacial Surgery Office. It was noted that there was a two week duration to the illness. There was no dental pain or stones. The impression was probable left sialadenitis/infection, possible tumor; secondary infection. On August 31, 2006, Dr. Peterson's record, it is noted that there was a phone call from Dr. Fratelleone. It is documented that Dr. Fratelleone increased the patient's antibiotic to Augmentin for 10 days, "he wants her to get a CAT scan of this area, to try to rule out a possible tumor of the submandibular gland. He will follow up with her in the next few days to check progress". Underneath the note, it is printed – Diagnosis "submandibular sialadenitis".

On September 3, 2006, the patient presented to the Riverview Medical Center Emergency Room, where she was seen by physician's assistant, Biedenbach. The chief complaint was "swollen glands", medications were Augmentin. The history stated that this was a 25-year-old female with a chief complaint of left lymph gland swelling x 2 weeks. The patient went to PMD and was given Amoxicillin and referred to dentist, who found no dental etiology. The patient was sent to

Page 3.
Laura Lomando

"OMF" and started on Augmentin three days ago, which helped a little. No fevers.  It is additionally stated, "mother brought her to the ER because of afraid it is a 'tumor.'"  Blood pressure was 116/78, temperature 98.4, pulse 100, respiratory rate 16.  On physical examination, lymphadenopathy was noted. Physician's assistant, Biedenbach, noted on his examination "positive swelling of lymph parotid, mild tender to palpation, no erythema, no ecchymosis and the TMJ's  intact bilateral". The diagnosis of physician's assistant Biedenbach was acute left parotitis. The patient was prescribed Motrin 600 mg t.i.d., p.r.n., #15 tablets. The patient was discharged home and was instructed to "follow up with ENT 2-3 days and lemon drops." The patient was also instructed to continue antibiotics. During that visit, the nurse documented "swollen gland x 1 ½ weeks, saw oral surgeon, put on antibiotics, no better. Left side of jaw with swelling and tenderness".  In deposition testimony,  physician's assistant Biedenbach notes that the patient did not have any night sweats or fever and he also noted that he asked the patient to follow up with an ENT specialist, but PA Biedenbach did not actually call an ENT consult during the Emergency Room visit, although a referral form was given for Dr. Phillip Passalaqua, "ENT".   Additionally, in deposition testimony, physician's assistant, Biedenbach, felt that the "swelling" was probably less than two finger widths, but he did not record this measurement. Dr. Roma was the supervising Emergency Room physician.

On September 5, 2006, the patient re-presented to the Emergency Room at Riverview Medical Center with a chief complaint of "chest pain, tightness, shortness of breath and an increase in symptoms today".  On triage, it was noted that the patient was not in acute distress, anxious and pain increases with inspiration.  The patient was seen by Dr. Reynolds, who noted a 25-year-old female with a chief complaint of chest tightness since starting Augmentin one week ago for swollen submandibular gland.  The patient seen in ED and given an appointment for ENT in one week.  She also complained of nausea and diarrhea since starting Augmentin.  In the ED, the patient had chest pain with deep inspiration/palpitations, no shortness of breath. The blood pressure was 114/77, temperature of 98.5, pulse 90, respiratory rate 16. On examination, there was left submandibular swelling. Electrocardiogram was done and was read as normal sinus rhythm, normal ECG. The diagnosis was medication reaction, muscle strain, swollen salivary gland.  The patient was given Toradol, which helped relieve the symptoms.  In deposition testimony, Dr. Reynolds stated "it was my feeling that her symptoms were a collection of problems, alleviate the Augmentin, alleviate the anxiety, and that would alleviate an on-going problem of muscle strain". The discharge diagnosis was also listed as chest wall pain.   The discharge recommendations were "the patient was asked to follow up in two days".  Additional notes: "sour patch candy or lemon drops for swollen duct, stop Augmentin. Take 3-4 Ibuprofen every 8 hours after a full meal.  Return to ED if swollen becomes such that you cannot swallow".

The patient was next seen at the Parker Family Health Clinic on September 9, 2006 by Dr. Sullivan. The chief complaint was swollen left glands.  The patient was complaining of being fatigued. Dr. Sullivan noted that there was a large left submandibular lymph node.  The ENT – ears, nose and throat were normal. Dr. Sullivan additionally noted a 1.2 cm lymph node left and right submandibular triangle and right axilla.  He noted that the patient had failed Amoxicillin and Augmentin. The impression was:  1) viral, 2) rule out lymphoma.   A CBC, monospot test and T3, T4 were ordered.  An aspiration biopsy on a p.r.n. basis was recommended and the patient was treated with Motrin.

The patient was next seen by Dr. Helmer on September 11, 2006, at the Parker Family Health Clinic.  The vital signs revealed a weight of 194, temperature of 98.3, pulse of 100, respiratory

Page 4
Laura Lomando

rate 22, BP 122/69.  Dr. Helmer noted that the patient's lesion increased in size since Saturday. The patient was exhausted and febrile. Dr. Helmer estimated the lesion to be 4 cm.  On examination, there was palpable adenopathy at right and left submental areas. Also, a right axillary lymph node was palpable. Additionally, Dr. Helmer wrote, "question increased liver edge".  Dr. Helmer felt that the next step was biopsy and discussed this with Dr. Sullivan and Dr. Minassian, who is a pathologist at Riverview Medical Center. Apparently, Riverview Medical Center was to call Mary Nicosia to confirm an appointment for a biopsy to be done.

On September 9, 2006, a complete blood count revealed an anemia with a hemoglobin of 11.2 and a hematocrit of 33.0.   The sedimentation rate was 67 and a monospot was negative. EBV titers revealed a normal IgG level of 0.68. The IgM titer was elevated at 3.56. It is to be noted n the Parker Family Health Clinic records, there is a baseline CBC performed on June 6, 2003 revealing a hemoglobin of 12.5 and a hematocrit of 35.0.

On September 12, 2006, Riverview Medical Center did call to confirm that the biopsy had been scheduled for September 25, 2006.

On September 15, 2006, the patient's mother called and spoke with Ms. Nicosia. The patient was febrile to 104 and 103 using different thermometers. She was lethargic with a stiff neck and could not walk well.  It was advised that she be taken to the Emergency Room.

On September 15, 2006, the patient was seen in the Emergency Room of Riverview Medical Center and complained of a fever to 104 degrees with diaphoresis, general body aches and nausea.  A history of Epstein-Barr was noted.  The nurse did note a mass in the left lower mandible. The patient was seen by Dr. Talbert, who noted a chief complaint of fever and headache. Dr. Talbert's history stated that the patient was a 25-year-old with malaise, body ache and headache with a temperature of 103.  The patient stated that she had a positive Epstein-Barr on Saturday. On examination, Dr. Talbert noted left anterior adenopathy. The vital signs were temperature of 99.3, pulse 130, respirations 16 and blood pressure was 102/59. On examination there was left anterior adenopathy.   Laboratory evaluation revealed white count of 4.1, hemoglobin of 10.6, hematocrit 30.7, platelets of 129,000. The differential revealed 79 polys, 11 lymphs and 9% monocytes. The urine was positive for bilirubin. The monospot was positive. Two blood cultures were done and eventually failed to grow bacteria. Electrocardiogram revealed sinus tachycardia with a ventricular rate of 117. On the ECG report of September 15, 2006, performed at 2001:37, it is noted that when compared to the ECG of September 5, 2006, the ventricular rate increased by 40 beats per minute. The sodium was 129, potassium 3.5, chloride 99 and CO2 was 22 (normal 24-31).  The discharge diagnosis was "infectious mononucleosis". In deposition testimony, Dr. Talbert said "after the blood work returned and it was positive for monospot, ı attributed the adenopathy to mononuclcosis, which is – adenopathy being common in mononucleosis". The patient was treated in the Emergency Room with an intravenous bolus of one liter of normal saline, followed by 200 cc per hour of normal saline. Reglan 10 mg intravenously was given one time and 1 gram of Tylenol was given orally. The blood pressure at 19:15 was 102/59. At 17:40, a nursing note documents on physical exam "a mass to left lower jaw." At 19:15, another nursing note documents "swelling left parotid gland". The nursing plan of care did indicate that the patient was anxious.  It is to be noted that an Incoming Patient Report

Page 5.
Laura Lomando

was filled out, the information being obtained from Mary at Parker Family Clinic, indicating that the nature of the complaint was Epstein-Barr, 103 temperature x 1 days, neck pain, lymph node, left submental biopsy, suspicious for meningitis.

On September 16, Mary Nicosia called the patient's mother and stated that the patient was seen in the Emergency Room and that blood work was drawn. The patient's mother stated 'Dr. Talbert saw her and said that biopsy was not necessary." The fever in the ER was 103 and Reglan was given to the patient.

On September 18, 2006, Mary Nicosia again spoke with the patient's mother, who stated that the patient was not eating and had abdominal pain.

On September 18, 2006, Dr. Helmer spoke with the patient's mother. He noted that the fever was down and the lymph nodes were smaller. There was stomach upset and an overall feeling of feeling better. He recommended that the patient be reevaluated on Thursday and that labs be checked. If better, and labs consistent with acute EBV, hold off on biopsy, if not better and labs inconsistent proceed.

On September 18, 2006, an extensive note was written by Mary Nicosia documenting that she called the patient's mother to check the status of the patient. The patient was very sleepy with a fever of 103. There were no focal symptoms. The patient was ambulating, but was weak with no mental status changes, no seizures, no aphasia, no hemiplegia. The symptoms of EBV were explained. Tylenol for fever and hydration was advised. The patient's mother was advised that if her symptoms worsened then she should go to the Emergency Room.

On September 20, 2006, the patient's mother called to say that the patient could not get words out and was having difficulty moving. This was discussed with Dr. Helmer who advised that the patient needed to be assessed. Two phone calls were made to the mother, there was no answer and messages were left on the answering machine.

On September 20, 2006, the Middletown Township Emergency Medical Services arrived at the patient's home. The medical emergency was "Epstein-Barr syndrome". The patient was found lying in her bed. The patient complained of a general feeling of weakness and disorientation. The patient related that when her mom talks to her, she cannot remember what was said. There was twitch in her left hand a hiccup that lasts "a while". The patient was noted to have problems focusing on a conversation. The patient's extremities were cold. She appeared yellow "jaundiced". Her mom stated that the illness started 5 weeks ago. The blood pressure was 90/60, respiratory rate 20, pulse was 145. The patient was transported to the Emergency Department of Riverview Medical Center. The patient was triaged at 14:55, the chief complaint was tachypnea, jaundice and weak. The temperature was 103.8, pulse 145, respiratory rate 30, temperature of 97, blood pressure 60/palp. The pulse oximetry was 97. The past medical history was listed as Epstein-Barr and left gland abscess. The patient was noticed to be jaundiced and tachypneic. Dr. Reynolds saw the patient and wrote "25 year-old-female seen a few times in the past month for left jaw swelling and seen on 9/15/06 for fever, today fever and jaundice. Blood work from 9/15 positive monospot. The patient was seen by ENT for jaw swelling, due for biopsy on 9/25/06. The patient is unable to eat or drink and has a temperature of 99 to 101. The past history was noted to Epstein-Barr. On examination, the patient was noted to be dehydrated, jaundiced,

Page 6
Laura Lomando

blood pressure 60/palp with a heart rate of 140 and a temperature of 103.8. No adenopathy was noted on the examination. The diagnosis was mononucleosis, hypoglycemia, abscess of jaw, and hepatitis. CT of the head and neck were ordered as well as a chest x-ray. One liter of normal saline by IV bolus was ordered. A Foley was placed. One amp of D50 was given and D5 ½ normal saline at 150 cc per hour was started. In the Emergency Room, the sodium was 120, the C02 was less than 11 and the K was 7.2, thought to be hemolyzed. The patient was admitted to the Intensive Care Unit after report was given at 19:40 with a diagnosis of sepsis and maxillary mass. The admitting physician was Dr. David Hyppolite. Antibiotics were ordered at 17:20 and 19:10 including Rocephin, Zithromax, Vancomycin and Gentamicin. The Zithromax was subsequently discontinued and Timentin was added at 19:10; Rocephin had been given at 17:45 in the Emergency Room. . Sodium bicarbonate was not administered in the Emergency Room. Initial laboratory testing at 15:41 in the Emergency Room documented a white count of 18.3, hemoglobin 11.5, hematocrit 33.1, with a platelet count of 207,000. There were 45 polys, 16 bands, 34% lymphocytes, 5 monocytes and 3 nucleated red cells. The urinalysis was positive for moderate bilirubin. The blood glucose was 39, BUN 34, creatinine 1.3. Sodium was 120 with a potassium of 7.2 (thought to be hemolyzed), chloride of 86, C02 less than 11. The anion gap was 33. The total protein was 4.6 (normal range 6.0-8.0). The total bilirubin was 10.0. The direct bilirubin was 6.2. The alkaline phosphatase was 332, GGT 580, AST 864, ALT 413. Acute phase hepatitis testing for hepatitis A, B and C was negative. Blood cultures were drawn and ultimately failed to grow microorganisms. A serum lipase was normal. On September 21, 2006 at 8:20 the peripheral differential revealed 2% myelocytes, 1% metamyelocytes and 6 nucleated red cells. The hemoglobin fell to 5.2, hematocrit 15.8 and the platelet count fell to 44,000. On September 21 at 0:5:00 a haptoglobin was less than 6 and the magnesium level was elevated at 3.5 (normal range 1.3-2.5). On September 25, at 05:00 a CK MB fraction was elevated at 9.4, but a troponin level was normal. On September 21, 2006, at 10:59, a serum LDH was 12,632. On September 21, 2006 at 08:20 the BUN rose to 31 and the creatinine rose to 2.0. On September 21, 2006 at 08:20 the AST was 6,760 and alkaline phosphatase 190, bilirubin 5.9, ALT 1,964, albumin 1.1. The anion gap was 29. On September 21, 2006 at 10:59 the uric acid was 15.4 (normal range 4.0-8.0). On September 20, 2006 at 6:33 a portable chest x-ray with an AP view of the chest revealed the heart to be top normal in size. An AP lordotic projection was obtained and the superior mediastinal region was not well-visualized. No acute abnormality was seen. On September 20, 2006, at 6:04 p.m. at CT of the brain and neck done with and without intravenous contrast and revealed no acute intracranial hemorrhage, mass effect or midline shift; the study was negative. The CT soft tissues of the neck revealed a very large mass-like area of infiltration involving the left submandibular gland. The gland measured up to 4.5 cm in size. There was also fullness involving the right submandibular gland which is mildly enlarged. There are areas of adenopathy or mass-like infiltration involving each parotid gland. On the left, this lies in the mid-gland and measures approximately 1.4 cm in size, on the right this lies in the inferior margin of the parotid and measures 1.6 cm. There is right carotid triangular adenopathy measuring up to 2.2 cm in size. There is evidence of right axillary adenopathy and right paratracheal adenopathy in the upper chest. The impression was multiple areas or adenopathy and infiltration of the submandibular and parotid glands. The primary diagnosis would be lymphoma. A handwritten preliminary report of the CT scan of the brain/neck also revealed mediastinal adenopathy. The patient was transferred to the Intensive Care Unit. Antibiotics were ordered as noted above. IV fluids, D5 ½ normal saline at 150 cc per hour was ordered at 17:20. On September 20, 2006 at 9:00 p.m. the IV was changed to D5 ½ normal saline at 150 cc per hour. On September 21, at 08:01, four units of packed red blood cells were ordered, type and cross matched, and to be transfused over four hours because of symptomatic anemia. At 08:53 an additional order was

Page 7.
Laura Lomando

written to transfuse two units of washed packed red cells stat because of symptomatic anemia. On September 21 at 5 a.m., the hospitalist was asked to evaluate the patient for respiratory distress and noted that "upon my arrival, the patient was in respiratory distress with respiratory rate 50, pulse oximetry 90 on oxygen." The patient appeared obtunded and was intubated by the hospitalist.  On September 21 at 6:05 a.m. the patient was hypotensive and did not respond to fluid bolus and Levophed was started. An NG tube had been passed and bright red nasogastric drainage was noted.   Dr. Raymond Flis was asked to see the patient in consultation. On September 21, at 7:00 a.m. he notes that he was in the midst of his physical examination when the patient's mother arrived. While he was having a discussion with the patient's mother, the patient became bradycardic and developed asystole and Code Blue was called. The patient was found to have a wide complex with tall T waves.   The morning blood work was recorded in the midst of the cardiac resuscitation and the serum potassium was 7.8. She had already been started on treatment for hyperkalemia with IV calcium chloride, sodium bicarbonate and regular insulin. The patient was successfully resuscitated, but developed asystole for a total of four times. Cardiac resuscitation was carried out intermittently over the next two hours until the patient developed asystole and was unresponsive to all treatment.   During this time, she received multiple doses of IV calcium chloride. She also received 50% dextrose and regular insulin intravenously and was treated with epinephrine, large amounts of sodium bicarbonate and Atropine for bradycardia.   On September 20, the last orders were written at 9:30 p.m.  Other than IV fluids, no orders had been written for the treatment of hyperkalemia.   The treatment of the hyperkalemia began at the asystolic event. The potassium 7.2 on September 20 at 15:41 was not treated. On September 20, 18:39, the potassium was repeated and was 5.5 (normal 3.5-5.3), on September 21, 2006 at 05:00 the potassium was 7.8 and September 21, at 08:20 the potassium was 7.4. On September 21, following intubation at 5:30 a.m. on 100% oxygen the pH was 6.99, pC02 41, p02 41 with a bicarb of 9.5.

During the admission, medical care was directed by Dr. Hyppolite.  Consultations had been performed by Dr. Raymond Flis, Dr. Adrian Pristas. Dr. Essinger had been called for ID consultation to manage the antibiotics.  Dr. Ahmad also wrote antibiotic orders.   An order had been written to consult Dr. Langhinhous relative to the lymphadenopathy. In the discharge summary, Dr. Hyppolite gives as a first diagnosis "possible tumor lysis syndrome". The third diagnosis is "left submandibular mass".   Additional diagnoses include – "dehydration, hyperkalemia, metabolic acidosis, multiple bilateral upper respiratory lymphadenopathy, acute liver failure secondary to blood loss, hypoglycemia, jaundice, cardiac arrest and mononucleosis with possible lymphoma".

A post-mortem examination was performed by Dr. Saleem on September 21, 2006 at 10 a.m. Examination of the neck showed multiple enlarged lymph nodes in the neck, both in the anterior and posterior neck regions measuring from 1 to 3.5 cm in the greatest dimensions. There is a single large submandibular nodule noted measuring 5 x 4 x 3 cm, which appears to be in continuity with the left submandibular gland. Examination of the thoracic cavity revealed a few enlarged hilar nodes noted in close proximity to the main bronchus, as well as the carinal region measuring 2 cm in their greatest dimension. In addition to the paratracheal and perihilar lymph nodes there are large mediastinal lymph nodes noted both in the anterior mediastinal, as well as the posterior mediastinum.   There are also enlarged lymph nodes in the paraaortic region. Examination of the abdominal cavity revealed the liver to be markedly enlarged weighing 3300 grams. The spleen was markedly enlarged weighing 840 gram.  Both the liver and spleen were

Page 8
Laura Lomando

studded with nodular lesions. The stomach had 15 cc of pinkish fluid. The pleural cavities contained 200 cc of straw-colored fluid on each side. The peritoneal cavity had 200 cc of straw-colored fluid. The final microscopic diagnosis was non-Hodgkin's lymphoma involving the lymph nodes, submandibular gland, liver, spleen and small intestine.  Additionally, it should be noted that on gross inspection of the thoracic cavity there was "paratracheal and perihilar lymph nodes that were enlarged, mediastinal lymph nodes noted both in the anterior mediastinum as well as the posterior mediastinum".

Additionally, I reviewed  the CAT scan of the neck, there were right jugulodigastric lymph nodes, the largest being 3.5 cm. On the left there was a 4.5 cm left submandibular necrotic lymph node. A 5.5 x 4.5 mediastinal mass was seen.

**CONCLUSION:**   It is my medical opinion that Laura Lomando had an aggressive form of non-Hodgkin's lymphoma, as indicated in the autopsy report, and expired as a direct result of a failure to make that diagnosis, which led to a spontaneous tumor lysis syndrome, that directly led to a cardiac arrest and death.  The following deviations from standard medical care occurred:

1.  On August 23, 2006, the patient was seen by Dr. Ayanian.  A tender left submental solitary lymphadenopathy was noted.  A complete blood count and chemical profile should have been performed.  The size of the lymph node should have been measured and documented.

2.  On August 28, 2006, Dr. Helmer noted tender left submandibular "?" node and measured this according to his deposition testimony to be 0.5 to 1 cm.  No other adenopathy was noted.  At this point in time, Dr. Helmer should have performed at least a complete blood count and chemical profile, which should have included liver function tests.  At this point in time, he should have either made a referral to an Ear, Nose and Throat Specialist or performed a CAT scan of the neck. The recommendation to push fluids and finish the Amoxicillin was not appropriate for a tender possible lymph node that was 0.5 to 1 cm in size.

3.  On August 31, 2006, Dr. Fratelleone recommended a CAT scan of the area in question. This was an appropriate recommendation.

4.  On September 3, 2006, physician's assistant Biedenbach saw the patient at the Riverview Medical Center Emergency Room.   The patient's mother brought her to the ER because she was afraid that it is a "tumor".  Physician's assistant Biendenbach was aware that the patient had been seen by an "OMF". The diagnosis of physician's assistant Biedenbach was acute left parotitis.  A referral was given to the patient to see an Ear, Nose and Throat specialist, Dr. Phillip Passalaqua. A CAT scan of the neck was indicated.   Additionally, physician's assistant Biedenbach should have directly scheduled an appointment with the Ear, Nose and Throat specialist to expedite an early visit.  In deposition testimony, physician's assistant Biedenbach states that he did not measure the size of the area in question, but noted that it was probably less than two finger widths.  A measurement should have been taken.  Laboratory tests should have been performed as well, that would include a complete blood count, chemical profile including liver function tests and serum LDH.

5. On September 5, 2006, the patient re-presented to the Emergency Room at Riverview Hospital Center with chest pain. The diagnosis was medication reaction, muscle strain and swollen

Page 9
Laura Lomando

salivary gland. The discharge diagnosis was also listed as chest wall pain. An electrocardiogram was performed. A chest x-ray should have been performed. The laboratory tests, including a complete blood count, chemical profile, liver function tests, and serum LDH should have been performed. A CAT scan of the neck and chest should have been performed.

6. The patient was next seen at the Parker Family Health Center on September 9, 2006 by Dr. Sullivan. Dr. Sullivan noted a large left submandibular lymph node. The ear, nose and throat examination was normal, and he additionally noted a 1.2 cm lymph node in the left submandibular triangle and right axilla. His impression was 1) viral disease and 2) rule out lymphoma. Laboratory tests including a CBC and monospot test were ordered. Dr. Sullivan suggested an aspiration biopsy on a p.r.n. basis. This was an appropriate recommendation. As Dr. Sullivan was considering lymphoma, he should have ordered a CAT scan of the chest, abdomen and pelvis. Additionally, the performance of the aspiration biopsy should have been carried out within 3-5 days.

7. The patient was next seen by Dr. Helmer on September 11, 2006. The patient was tachypneic with a respiratory rate of 22 and tachycardic with a pulse of 100. Dr. Helmer noted that the patient's lesion had increased in size since Saturday. He estimated the lesion to be 4 cm. He documented a palpable adenopathy in the right and left submental areas and the right axillary lymph node. He also documented a "? increased liver edge". Dr. Helmer felt that the next step was a biopsy. Dr. Helmer should have admitted to the patient to the hospital or have expedited an outpatient biopsy.

8. On September 12, 2006, Riverview Medical Center did call to confirm that the biopsy had been scheduled for September 25, 2006. As Dr. Helmer had documented that the lesion had increased in size over two days and that the lesion was 4 cm, a biopsy needed to be done significantly sooner than the 13 day interval that was arranged for. A biopsy could have been done by September 14, or the patient could have been admitted to the Hospital.

9. Laboratory tests from September 9 indicated that the patient had an anemia with a hemoglobin of 11.2 and hematocrit of 33, compared to a June 6, 2003 hemoglobin of 12.5 and a hematocrit of 35. Therefore, the patient had a new anemia. The sedimentation rate was elevated at 67. A monospot was negative but the EBV IgM titer was elevated indicating possible mononucleosis. Although the IgM titer is consistent with mononucleosis, the presentation of asymmetric lymphadenopathy is not consistent with mononucleosis and is more consistent with lymphoma.

10. On September 15, the patient re-presented to the Emergency Room at Riverview Medical Center with a fever of 104 degrees, diaphoresis, body aches and nausea. The nurse did note a mass in the left lower mandible. Dr. Talbert noted left anterior adenopathy. The temperature was 99.3, pulse 130 and blood pressure 102/59. The white count was 4.1, hemoglobin 10.6, hematocrit 30.7, platelet count 129,000. The urine was positive for bilirubin. The monospot was positive. The electrocardiogram revealed a new sinus tachycardia. The sodium was 129 and the C02 was low at 22. The patient was discharged from the Emergency Room with a diagnosis of infectious mononucleosis after receiving fluids. Admission to the Hospital should have occurred. The patient had a history of a significant fever and was tachycardic. A monospot test was positive, but the patient had bilirubin in the urine and was hyponatremic with a low C02. Dr. Talbert's examination documented left anterior adenopathy. The hemoglobin was 10.6, the hematocrit was 30.7 and the platelet count was low at 129,000. A hemoglobin of 10.6, hematocrit

Page 10
Laura Lomando

of 30.7 and platelet count of 129,000, as well as hyponatremia and low C02 all added up to a patient with a very likely underlying malignancy, despite having a positive mono test, and very possible early sepsis syndrome. The patient should have been admitted to the Hospital for observation and the performance of blood and urine cultures and a CAT scan of the body. The patient needed to be seen by an Ear, Nose and Throat physician, Infectious Disease specialist and Oncologist.

11. On September 16 and September 18, there were phone conversations between Mary Nicosia and Dr. Helmer.  Mary Nicosia was made aware of the Emergency Room visit on September 15. The findings of that Emergency Room visit could have been investigated and a recommendation as a result of these findings for admission to the hospital should have been made.

12. On September 20, 2006, the Middletown Township Emergency Medical Services brought the patient to the Emergency Department of Riverview Medical Center. The patient was triaged at 14:55. The blood pressure was 90/60, respiratory rate 20, pulse 145, temperature of 103.8.  Upon triage, the patient was noted to be tachypneic, jaundiced and weak. The temperature was 103.8, pulse 145, respiratory rate 30, pulse oximetry 97 and blood pressure 60/palp. The Emergency Room diagnosis was mononucleosis, hypoglycemia, abscess jaw and hepatitis. A CAT scan of the head and neck were ordered, as well as a chest x-ray. IV fluids were given. The sodium was 120, the C02 was less than 11 and potassium was 7.2, thought to be hemolyzed.  The patient was treated with the antibiotic Rocephin in the Emergency Room, and additional antibiotics were ordered eventually, although not timely enough, and given IV fluids. Sodium bicarbonate was not administered in the Emergency Room. The sodium was 120, the anion gap was 33, the total bilirubin was 10.  On September 21, 2006, the peripheral differential revealed 2% myelocytes, 1% metamyelocytes and 6 nucleated red cells. The hemoglobin fell to 5.2 and hematocrit 15.8 and platelet count fell to 44,000. A haptoglobin was less than 6 indicating a probable hemolytic anemia. A serum LDH was 12,632.  The CAT scan of the neck revealed a very large mass-like area of infiltration involving the left submandibular gland. The gland measured up to 4 cm in size. There was also fullness involving the right submandibular gland. There were areas of adenopathy or mass-like infiltration involving each parotid gland.  The impression was lymphoma.  A uric acid level was not performed until September 21 at 10:59 and was 15.4.  The patient presented with a sepsis type syndrome, antibiotics were not started timely. The patient was hyperkalemic and this was treated initially with fluids only. The patient did have a cardiac arrest the next day. At that point in time, the hyperkalemia was aggressively treated for the first time. However, the potassium never fell within normal limits.  A uric acid level was not tested on the day of admission. The elevated uric acid level was never treated. Aggressive treatment with at least allopurinol and more appropriately rasburicase should have occurred. The patient did have a drop in the hematocrit in the face of pink material being retrieved from the NG tube indicating a possible GI bleed and in the face of a low haptoglobin and high LDH indicating a possible hemolytic anemia. Neither of these conditions were treated. The patient had an asystolic cardiac arrest as result of metabolic abnormalities induced by a spontaneous tumor lysis syndrome, that called for immediate treatment on arrival to the Emergency Room. The acidosis and hyperkalemia should  have been more aggressively treated.   The hyperuricemia was untreated.  It was not until the patient had a cardiac arrest that the hyperkalemia was aggressively treated for the first time.  The lack of aggressive treatment of the tumor lysis syndrome caused the cardiac arrest and death.

Page 11
Laura Lomando

The post-mortem examination yielded a final microscopic diagnosis of non-Hodgkin's lymphoma involving the lymph nodes, submandibular gland, liver, spleen and small intestine.  On gross inspection of the thoracic cavity, there was "paratracheal and perihilar lymph nodes that were enlarged, mediastinal lymph nodes noted both in the anterior mediastinum as well as the posterior mediastinum".  My review of the CAT scan of the neck clearly showed right jugulodigastric lymph nodes and a 4.5 cm left submandibular necrotic lymph node.  There was a 5.5 x 4.5 mediastinal mass.

Laura Lomando died as a result of a failure to diagnose lymphoma and as a result of failure to aggressively treat the metabolic consequences of a spontaneous tumor lysis syndrome.  There were enough clinical signs present so that a diagnosis of lymphoma could have been made in August 2006, given the presentation of the left-sided solitary lymphadenopathy. Had this diagnosis been made earlier, the patient could have received chemotherapy and would have had a reasonable chance of a cure.   Had the patient been admitted to Riverview Medical Center sooner than September 20, or had the patient received immediate intensive medical treatment on September 20 to reverse the metabolic abnormalities of a tumor lysis syndrome on September 20, she could have been stabilized, had a biopsy, which would have led to a diagnosis and then chemotherapy giving her an excellent chance of remission or cure. Clearly, the September 15, 2006 visit to the Emergency Room had enough warnings by history, physical examination and laboratory evaluation that should have led to an admission, diagnosis of lymphoma and institution of therapy and prevention of the spontaneous tumor lysis syndrome that occurred on this September 20, 2006 admission.

In conclusion, points one through twelve listed above all represent deviations from the standards of care that directly caused Laura Lomando's death and directly led to unnecessary and increased pain and suffering.

Sincerely,

Mark A. Fialk, M.D., PC

MAF:eh

# CURRICULUM VITAE

**NAME:**            **Mark A. Fialk, MD, FACP**

**OFFICE ADDRESS:**            259 Heathcote Road, Scarsdale, NY 10583

**DATE OF BIRTH:**            June 24, 1947

## EDUCATION:

1961-1965            Jersey Academy, Jersey City, NJ

1965-1969            Clark University, Worcester, MA
                     AB in Chemistry
                     Phi Beta Kappa
                     Magna Cum Laude
                     Honors in Chemistry

1969-1973            Tufts University School of Medicine

## POSTGRADUATE TRAINING:

1973-1974            INTERNSHIP
                     Cornell-Cooperating Hospitals
                     The New York Hospital-Cornell Medical Center
                     Department of Medicine

1974-1975            RESIDENCY
                     Junior Assistant Resident
                     Cornell-Cooperating Hospitals
                     The New York Hospital-Cornell Medical Center
                     Department of Medicine

1975-1976            Senior Assistant Resident
                     Memorial Sloan-Kettering Cancer Center
                     Intramural Senior Assistant Resident
                     Assistant Physician, Department of Medicine
                     The New York Hospital

**Mark A. Fialk, MD, FACP**
-2-

## POSTGRADUATE TRAINING (CONTINUED):

1976-1977        FELLOWSHIP
                 Clinical Fellow, Hematology-Oncology
                 The New York Hospital-Cornell Medical Center
                 Division of Hematology-Oncology
                 R. Nachman, M.D., Chief

                 Emergency Room Fellow
                 The New York Hospital

1977-1978        Clinical Fellow, Hematology-Oncology
                 The New York Hospital-Cornell Medical Center

                 Visiting Research Fellow
                 Department of Developmental Hematopoiesis
                 Memorial Sloan-Kettering Cancer Center
                 M.A.S. Moore, Ph.D., Director

                 Emergency Room Fellow
                 The New York Hospital

1978-1979        Clinical Fellow, Infectious Diseases
                 Memorial Sloan-Kettering Cancer Center
                 Division of Infectious Diseases
                 D. Armstrong, M.D., Chief

                 Clinical Fellow, Hematology-Oncology
                 The New York Hospital-Cornell Medical Center
                 Visiting Research Fellow
                 Department of Developmental Hematopoiesis
                 Memorial Sloan-Kettering Cancer Center

                 Physician, Employee Health Service
                 Jane W. Magill, M.D., Director

## TEACHING APPOINTMENTS:

1974-1978        Fellow in Medicine
                 Cornell University Medical College

1978-1979        Instructor of Medicine
                 Cornell University Medical College

1979-Present     Clinical Assistant Professor of Medicine
                 New York Medical College

Mark A. Fialk, MD, FACP
-3-

## HOSPITAL APPOINTMENTS:

| | |
|---|---|
| 1979-Present | Attending Physician<br>White Plains Hospital Center |
| | Assistant Attending Physician<br>Westchester County Medical Center |
| 1980-1986 | Assistant Attending Physician<br>Saint Agnes Hospital |
| 1981-Present | Attending Hematologist<br>White Plains Hospital Center |
| 1990-1992 | Chief of Hematology<br>White Plains Hospital |

## LICENSURE:

Current                    New York State #120660

## CERTIFICATIONS:

| | |
|---|---|
| 1974 | Diplomate, National Board of Medical Examiners |
| 1976 | Diplomate, Internal Medicine<br>American Board of Internal Medicine |
| 1977 | Diplomate, Medical Oncology<br>American Board of Internal Medicine |
| 1978 | Diplomate, Hematology<br>American Board of Internal Medicine |
| 2004 | Diplomate, Hospice and Palliative Medicine<br>American Board of Hospice and Palliative Medicine |

**Mark A. Fialk, MD, FACP**
-8-

**ABSTRACTS:**

1.    Fialk, M.A., Lerner, S.E., Stevens, R.E., Lee, H.J., Duff, K.: Prostate Cancer Treatment: A Multidisciplinary Approach, American Society of Clinical Oncology, 40th Annual Meeting Proceedings, Vol. 23, Abstract 4666: 421 (2004)

2.    Lerner, E.G., Berk, R./D., Fialk, M.A., et al.  A Community Hospital Enhanced Screening Program for Women at High Risk for Breast Cancer.  Presented at American College of Breast Surgeons.  March 2005

# DR. MARK FIALK
# TRIAL TESTIMONY HISTORY

**Matter/Year**                                   **Venue**

**2010**

1.   Pizengokl v. Maimonides                 Kings County

2.   Schultz v. Atalah                       New York County

3.   Franco v. Lubin                         Bronx County

**2009**

1.   Young v. Gulekjian                      Venue Unknown

2.   Scully v. Farella                       Rockland County

3.   Crawford v. Albano                      Richmond County

4.   Steimer v. Grace                        New York County

5.   Castle v. Friedman                      Venue Unknown

6.   Hansen v. Forlenza                      Richmond County

**2008**

1.   Earle v. S.I. Radiology Associates      Richmond County

2.   Smith v. Brookdale                      Queens County

3.   Buros v. St. Vincents                   New York County

4.   Schafter v. Batheja                     Westchester County

5.   Fury v. Barak                           Bronx County

6.   Vaugh v. Sirsi                          Venue Unknown

7.   Feldman v. Rifkin                       Nassau County

**2007**

| | | |
|---|---|---|
| 1. | Charles v. Tanel | Venue Unknown |
| 2. | Barcelar v. Pann | Venue Unknown |

**2006**

| | | |
|---|---|---|
| 1. | Markus v. Bosio | Westchester County |
| 2. | Marafino v. Southern Westchester | Westchester County |
| 3. | Butler v. Leahy (Lyall) | New York County |
| 4. | Cardenales v. Queens LI Medical Group | Queens County |
| 5. | Difede v. Galdieri | Richmond County |
| 6. | Cohen v. Lofty | New York County |
| 7. | Pollard v. Garfield, Gary | Sullivan County/ County Court |

**2005**

| | | |
|---|---|---|
| 1. | Green v. Mataratne | Venue Unknown |
| 2. | Estevez v. Coleman | New York County |
| 3. | Anato v. Ramsy | Venue Unknown |
| 4. | Simms v. New York State | Westchester County |

**RONAN, TUZZIO & GIANNONE**
**4000 ROUTE 66**
**One Hovchild Plaza**
**Tinton Falls, NJ 07753**
**(732) 922-3300**
**Attorneys for Defendant, RIVERVIEW MEDICAL CENTER**
**Our File No. 155.8224 MANW/HPB**
**Henry P. Butehorn - (7147 HPB)**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **INES LOMANDO, as Administratrix Ad Prosequendum of the Estate of LAURA LOMANDO, deceased,** | **CIVIL CASE NO.: 3:08-CV-04177-FLW-TJB** |
| **Plaintiff(s)** | **ORDER** |
| **vs.** | |
| **THE UNITED STATES OF AMERICA, STEPHANIE REYNOLDS, M.D., TREVOR TALBERT, M.D., DAVID HYPPOLITE, M.D., PARKER FAMILY HEALTH CENTER, RIVERVIEW MEDICAL CENTER, EMERGENCY PHYSICIAN ASSOCIATES NORTH JERSEY, PC, JOHN DOE #1 through #5, MARY MOE #1 through #5 (fictitious names representing unknown physicians, nurses, technicians, medical groups, medical facilities and/or other medical providers who participated in the medical care of the plaintiff)m, jointly, severally and in the alternative,** | |
| **Defendant(s)** | |

THIS MATTER having been opened to the Court upon the application of Ronan, Tuzzio & Giannone, attorneys for Defendant, RIVERVIEW MEDICAL CENTER, and the Court having considered the moving papers and opposition papers, if any; and good cause having been shown;

IT IS on this _____ day of _____, 2010;

ORDERED that   Summary Judgment be and is hereby granted in favor of Defendant, RIVERVIEW MEDICAL CENTER; dismissing Plaintiff's Complaint and any and all Crossclaims asserted against said Defendant, with prejudice; and,

IT IS FURTHER ORDERED that a copy of this Order be served on all counsel within seven (7) days of the date hereof.

_____
                                                                      J.S.C.

_____Opposed
_____Unopposed