**\*\*FOR PUBLICATION\*\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| INES LOMANDO as Administratrix Ad | : | |
| Prosequendum of the Estate of Laura | : | |
| Lomando, deceased, | : | |
| Plaintiff, | : | **Civil No. 08-4177 (FLW)** |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**WOLFSON, United States District Judge:**

Presently before the Court are several motions for summary judgment brought by Defendants Riverview Medical Center, the United States, and, collectively, by Drs. Reynolds, Talbert, and Emergency Physician Associates of North Jersey, P.C., pursuant to Federal Rule of Civil Procedure 56(c), to dismiss the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., medical malpractice, and wrongful death claims brought by Plaintiff Ines Lomando, as administratrix ad prosequendum for the estate of Laura Lomando.  For the reasons that follow, the Court grants each summary judgment motion.  Granting of the United States' motion deprives this Court of federal question jurisdiction over the sole remaining defendant, Dr. Hyppolite, who has not moved for summary judgment.  The

1

Court declines to exercise supplemental jurisdiction over that defendant.

## I.       BACKGROUND

The following facts are undisputed by the parties.  In August and September of 2006, Laura Lomando ("Laura"), daughter of Plaintiff, sought and received treatment at the Parker Family Health Center ("Parker Health"), a New Jersey non-profit health clinic, for an enlarged gland in her neck.  The treatment she received was provided by Drs. Zaven Ayanian, Lynn Helmer, and Timothy Sullivan, who each served as volunteer physicians at the clinic.  On September 12, 2006, one of these doctors recommended that Laura undergo a biopsy of her enlarged gland in order to determine if it was cancerous. Unfortunately, before the biopsy was completed, Laura passed away on September 21, 2006, while under the care of a local hospital, the Riverview Medical Center ("Riverview"). She died of complications of Non-Hodgkins Lymphoma, a form of cancer.

Prior to her death, in September 2006, Laura also received treatment at Riverview's emergency room.  She visited the emergency room on September 3, 5, 15, and 20, 2006. During those emergency room visits, she was treated by Theresa Biendenbach, P.A., Dr. Stephanie Reynolds, and Dr. Trevor Talbert.  Laura presented with several symptoms on these dates, including chest tightness, nausea, diarrhea, chest pain, fever, swelling, and an enlarged lymph node on the left side of her neck.  During the September 3, 5, and 15th visits, no doctor or physician assistant diagnosed her with cancer.  Rather, several other

2

diagnoses were offered, including meningitis.  At her final visit on September 20, 2006, she presented with symptoms attributable to spontaneous tumor lysis syndrome.  Dr. Reynolds ordered diagnostic tests for Laura and admitted her into the hospital under Dr. David Hyppolite's care.  Dr. Hyppolite treated her on September 20 and 21st, until her death.

Plaintiff, as administratix for the estate of her daughter, Laura, subsequently brought the instant malpractice and wrongful death action, asserting a claim under the FTCA against the United States along with claims against Riverview Medical Center, Dr. Reynolds, Dr. Talbert, Dr. Hyppolite, Parker Family Health Center, and Emergency Physician Associates of North Jersey, P.C..  In support of her claims, Plaintiff retained two experts: Drs. Fialk and Hayes.  Dr. Failk, an internal medicine, hematology, and oncology specialist, prepared an expert report  opining that the acts and omissions of Drs. Ayanian, Helmer, Talbert, and Reynolds contributed to Laura Lomando's death.  See Sarrol Cert., Exh. S.  Dr. Hayes, an otolaryngology specialist, prepared a report focusing on the acts and omissions of Dr. Sullivan.  See id. at Exh. U.

Each of the remaining defendants, with the exception of Dr. Hyppolite, have moved for summary judgment on Plaintiff's claims.[1]  The Court previously granted summary judgment in favor of Parker Family Health Clinic.  The Court now rules upon the motions

---

[1]      While Dr. Hyppolite did not file a motion for summary judgment, he filed a letter noting that, in the event the Court grants the United States' motion for summary judgment, he intends to seek an allocation of damages against the United States and all other liable codefendants.  See Gierla Letter dated July 14, 2010.

brought by Riverview Medical Center, the United States, and, collectively, by Drs. Reynolds, Talbert, and  Emergency Physician Associates of North Jersey, P.C..  Each of these motions will be granted, for the reasons that follow.

## II.     STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

## III.    DISCUSSION

4

There are several pending motions for summary judgment. First, Defendant Riverview Medical Center moves for summary judgment based on Plaintiff's failure to provide expert reports or testimony in support of Plaintiff's claim against it.  Second, the United States moves on immunity grounds. Finally, Drs. Reynolds and Talbert, along with Emergency Physician Associates of North Jersey, P.C. (collectively, "ER Defendants") move for failure to comply with N.J.S.A. 2A:53A-41 or, in the alternative, move to disqualify Plaintiff's expert reports on net opinion grounds.  I address each motion in the order in which they were filed.

## A.    Riverview Medical Center's Motion for Summary Judgment

Defendant Riverview Medical Center moves for summary judgment on Plaintiff's claim for failure to provide expert reports.  As Defendant correctly argues, to establish a prima face case of malpractice in New Jersey, "a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury."  Gardner v. Pawliw, 150 N.J. 359, 376 (1997).  See also Gonzalez v. Silver, 407 N.J.Super. 576, 587 (App. Div. 2009).  The same holds true for a wrongful death claim.  See Phillips v. Gelpke, 190 N.J. 580, 591 (2007) (citing with approval case holding that expert testimony is necessary in wrongful death action).  The only exception to this rule is where the breach of duty is not "so esoteric that jurors of common judgment and experience [can] form a valid judgment" without the need of expert

testimony.  Id. (quoting Scully v. Fitzgerald, 179 N.J. 114, 127 (2004)).

Plaintiff does not dispute that she has failed to provide any expert testimony against Riverview.  Indeed, Plaintiff does not substantively challenge Riverview's motion in any way.  Nor does she assert that the common knowledge exception applies.  Rather, in her opposition papers, Plaintiff sought leave to complete depositions of the experts before Riverview's motion was decided.[2]  The date for completing expert depositions has now passed, and the Court has not received any further submission from Plaintiff suggesting that any deposition testimony supports Plaintiff's claim against Riverview.  Accordingly, Riverview's motion for summary judgment is granted.

## B.    The United States' Motion for Summary Judgment

The United States asserts two immunities in support of its motion for summary judgment—the New Jersey Charitable Immunities Act, N.J.S.A. 2A:53A-7, et seq. ("NJCIA"),  and the federal Volunteer Protection Act, 42 U.S.C. §§ 14501-14505.  In connection with both immunities, the United States contends that, pursuant to 28 U.S.C. § 2674, it is entitled to claim any immunity available to the volunteer physicians at Parker Health.  For the reasons that follow, the Court agrees that the United States may claim any

---

[2]    Plaintiff, further, requests that, should the Court grant Riverview's motion, all cross-claims against Riverview be dismissed and any remaining defendants be precluded from asserting fault against the hospital at trial.  For the reasons explained infra, all remaining defendants, with the exception of Dr. Hyppolite, are entitled to summary judgment, and the Court declines to exercise supplemental jurisdiction over the claims against Dr. Hyppolite.  Hence Plaintiff's request is now moot.

such immunities and, specifically, finds that the United States is entitled to immunity under the NJCIA.

### 1.    The United States as the Physicians' Deemed Employer

Plaintiff's FTCA claim is based on the role of the United States as employer, for FTCA purposes, of the volunteer physicians at Parker Health.  This mechanism is concisely explained by the Sixth Circuit in <u>Wilson v. Big Sandy Health Care, Inc.</u>, 576 F.3d 329 (6th Cir. 2009), an opinion in which the court details how the Federally Supported Health Centers Assistance Act of 1992 operates to create the legal fiction of federal employee status for volunteer physicians:

> Pursuant to the provisions of 42 U.S.C. § 254b(c)(1)(A), the government "may make grants to public and nonprofit private entities for projects to plan and develop health centers which will serve medically underserved populations." In part due to the relatively high cost of obtaining malpractice insurance for treatment of such high-risk patients, however, the efforts to provide necessary medical care in such underserved areas initially faced significant roadblocks. To alleviate the financial burden on the medical providers, Congress passed the Federally Supported Health Centers Assistance Act of 1992, 42 U.S.C. § 233, through which practitioners at certain health centers providing necessary medical services "shall be deemed to be ... employee[s] of the Public Health Service." 42 U.S.C. § 233(g)(1)(A). By virtue of being "deemed" federal employees, personal injury, negligence, and malpractice suits against such individuals and centers are circumscribed by the limitations imposed by the Federal Tort Claims Act. See 42 U.S.C. §§ 233(g)(1)(A) and 233(a).

<u>Id.</u> at 333.  The Federally Supported Health Centers Assistance Act of 1992 is an

amendment to the Public Health Service Act ("PHSA"), which is codified at 42 U.S.C. § 233. <u>Santos ex rel. Beato v. U.S.</u>, 559 F.3d 189, 192 (3d Cir. 2009).

At the time of its passage, this statute complemented the 1988 "Westfall Act, also known as the Federal Employees Liability Reform and Tort Compensation Act," which amended the FTCA to "provide[ ] federal employees acting within the scope of their employment absolute immunity from damage liability on state law tort claims." <u>Brumfield v. Sanders</u>, 232 F.3d 376, 379 (3d Cir. 2000). Through the interplay of the FTCA and PHSA, as amended, Congress "direct[s] how suits could be prosecuted against those entities doing the work of the federal government by providing goods and services." <u>Id.</u> at 335; <u>Bogues v. U.S.</u>, 703 F.Supp.2d 318, 324 (S.D.N.Y. 2010) (citing 42 U.S.C. § 233(g)-(n)).

The purpose underlying PHSA's extension of FTCA coverage to certain nonprofit health centers that reach medically underserved populations, and their physician volunteers, is to assist nonprofit health centers in reducing their malpractice insurance costs so that "more funds are available for direct service to underserved populations ...." <u>Lacey-Echols v. Murphy</u>, Civ. No. 02-2281, 2003 U.S. Dist. LEXIS 27415, * 13 (D.N.J. Dec. 17, 2003). <u>See also</u> <u>Wilson</u>, 576 F.3d at 333 (noting that the Act was passed "[t]o alleviate the financial burden [of obtaining malpractice insurance] on the [nonprofit health center] medical providers"). Volunteers that serve these nonprofit health centers are deemed employees of the Public Health Service in furtherance of this goal, and to protect the

volunteers from suits related to their medical and surgical functions.  Cf. Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000) (discussing general purpose of § 233(a)).

Pursuant to the FTCA, plaintiffs may sue the United States in federal district court for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. §§ 1346(b)(1); 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions [of the FTCA] relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances ...."). See Santos, 559 F.3d at 193.  "In order to bring an FTCA action against the United States for medical malpractice committed by a health center or one of its [volunteer] physicians, the health center or physician must have been deemed to be a federal employee at the time of the alleged wrongful conduct." Bogues, 703 F.Supp.2d at 324.

Here, by way of a letter from the United States Department of Health and Human Services dated January 27, 2006, the aforesaid volunteer physicians were deemed employees of the Public Health Service ("PHS employees") for FTCA purposes.  Nicosia Decl., Exh. 6 at 1-2 (stating that Drs. Ayanian, Helmer, and Sullivan are "deem[ed] . . .

9

employees of the [Public Health Service] for purposes of Federal Tort Claims Act (FTCA) medical malpractice liability coverage, effective January 1, 2006 . . . [and] for the remainder of the calendar year ....").  Both parties agree that this designation is permitted by, and consistent with the dictates of, the PHSA.[3]

The parties, further, agree that the FTCA provides that the governing law is that of where the challenged act occurred; the FTCA does not create a substantive cause of action but "confers a procedural remedy by which substantive state law can be applied against the federal government."  Nazzaro v. United States, 304 F.Supp.2d 605, 616 (D.N.J. 2004) (quoting Weber v. United States, 991 F.Supp. 694, 696 (D.N.J. 1998)) (alterations omitted). See FDIC v. Meyer, 510 U.S. 471, 478 (1994).  Because Laura Lomando's death occurred in New Jersey, the law of that state controls.  Santos, 559 F.3d at 193.

The parties' disagreement centers on whether the United States may assert immunities available to the individual volunteer physicians.  The United States argues that it is entitled to claim any immunity available to individual volunteer physicians because

_____

[3]	As noted by the U.S. Supreme Court in Hui v. Castaneda, – U.S. – , 130 S.Ct. 1845 (2010), "proof of scope [of employment is] in most § 233(a) cases established by a declaration affirming that the defendant was a PHS official during the relevant time period."  Id. at 1854.

a provision in the FTCA, 28 U.S.C. § 2674, permits the United States to assert immunities available to its employees.  That provision provides, in pertinent part:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
>
> *        *        *
>
> With respect to any claim under this chapter, the United States *shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim,* as well as any other defenses to which the United States is entitled.

28 U.S.C. 2674 (emphasis added).

Plaintiff argues that, particularly with respect to the United States' claim to immunity under the Volunteer Protection Act,  section 2674 should not permit the United States to assert immunities available to the physicians because the United States serves as the physicians' employer for FTCA purposes.  In this way, so Plaintiff's argument goes, the united States stands in the shoes of the nonprofit health center and may assert only those immunities available to such centers under federal and state law.  Noticeably, Plaintiff does not cite any authority in support of its argument and its entire briefing on the issue consists

of one paragraph.[4]  However, this Court's research has revealed case law pertinent to this question, which case law merits discussion.

Some cases interpreting 28 U.S.C. § 2674 assign the United States the status of a private employer, see, e.g., Starnes v. U.S., 139 F.3d 540, 542 (5th Cir. 1998) ("Under the FTCA, the United States can assert the same defenses available to private citizens, including the borrowed servant defense."); Wilcox v. U.S., 910 F.2d 477 (8th Cir. 1990) (holding that United States may assert statutory employer defense to a worker's compensation action brought against a government contractor deemed to be a United States instrumentality for FTCA purposes); id. at 479 (collecting cases); McSwain v. U.S., 291 F.Supp. 386, 388 (D.C.Pa. 1968) ("if a particular defense is not available to a private employer, it is not available to the United States")[5], while other cases equate the United States with its employees, see, e.g., McElroy v. U.S., 861 F.Supp. 585, 594 (W.D.Tex. 1994) ("the United States may invoke any defenses available to individual law enforcement officers ....")[6].

_____

[4]     Other than this argument, the remainder of Plaintiff's opposition brief consists of a one page discussion of Cuoco, supra, which Plaintiff cites for the proposition that the United States is properly substituted for public health employee defendants.

[5]     Indeed, the United States cites to a case in its briefing that makes this point. Giannuzzi v. U.S., 585 F.Supp. 1306, 1310 (W.D. Pa. 1984), states that "[i]n a tort action, the United States *assumes the characteristics of a private employer* [, and . . . ] the federal government, in its assumed role of a private entity, is subject to the liability and immunity offered by state law."  Id. at 1310 (emphasis added).

[6]     The United States' citation to Knowles v U.S., 29 F.3d 1261(8th Cir. 1994), supports this reading of § 2674, although that court did not cite authority for its

When passing the Westfall Act, Congress noted that "[t]he United States, through the Federal Tort Claims Act, is responsible to injured persons for the common law torts of its employees *in the same manner in which the common law historically has recognized the responsibility of an employer for torts committed by its employees within the scope of their employment*." Liability Reform Act, P.L. 100-694, 102 Stat. 4563, § 2 (Findings and Purposes) (1988) codified as 28 U.S.C. § 2671 (Note) (emphasis added). See also Laird v. Nelms, 406 U.S. 797, 801 (1972) ("Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable *according to state law under the doctrine of respondeat superior ....*") (emphasis added).

In contrast to these variances in the case law, the plain language of section 2674 of the FTCA strongly suggests that it permits the United States to assert immunities available to its employees. The statute provides that the United States may assert any "judicial or legislative immunity which otherwise would have been available *to the employee of the*

---

interpretation of the statute. Id. at 1265. In fact, Knowles suggests that the United States stands in the shoes of both health institutions and physicians. See id. ("The United States, under the FTCA, is held liable to the same extent as a private party. In this case, the United States is standing in the shoes of a hospital [and] a doctor ...."). The United States' citation to Reo v. United States, 98 F.3d 73 (3d Cir. 1996), however, is unhelpful on the question of immunities available to the United States. The language from that case, to which the United States points, addresses the use of settlement agreements in FTCA actions. Govt. Reply at 4 (citing Reo, 98 F.3d at 76).

*United States whose act or omission gave rise to the claim*, as well as any other defenses to which the United States is entitled." 28 U.S.C. § 2674 (emphasis added). Congress' specific reference in section 2674 to the "employee" whose acts or omission gave rise to the claim appears to indicate that Congress intended to grant the United States the right to assert immunities available to employees.

Ultimately, however, I need not decide whether the United States is entitled to assert immunities available to employees. The answer to that question does not alter my analysis under the NJCIA because that statute grants immunity to both nonprofit health centers and individual physicians. Whether the United States is entitled to assert immunities available to the individual physicians is relevant to the Court's VPA analysis because that Act grants immunity only to volunteer physicians and not to nonprofit health clinics. But, because I may rest my decision solely on NJCIA grounds, I choose not to rule on the interplay of general FTCA immunity with the PHSA's deemed employee language in a case that does not depend upon resolution of that potentially knotty issue. Instead, I now turn to the applicability of the NJCIA.

## 2.    New Jersey Charitable Immunity Act

Whether or not the United States is entitled to immunity under the VPA, the United States is entitled to assert immunity under the New Jersey Charitable Immunity Act.[7]

---

[7]    It is important to note that the VPA preempts inconsistent state law. <u>See</u> 42 U.S.C. § 14052(a) ("This chapter preempts the laws of any State to the extent that such laws

Under that Act, "a statutorily enumerated institution . . . that . . . '(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works" may be entitled to immunity. Tonelli v. Bd. of Educ. of Tp. of Wyckoff, 185 N.J. 438, 444-45 (2005). "The primary purposes of the Act [are] protecting private trust funds and contributions, encouraging altruistic activity and private philanthropy, and relieving the government of the obligation of providing beneficent services ...." Id. at 448. In light of these weighty legislative purposes, courts are directed to "interpret the immunity liberally." Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 539 (1984). See also N.J.S.A. 2A:53A-10 ("This act shall be deemed to be remedial and shall be liberally construed ....").

With respect to individual volunteers of charitable organizations, N.J.S.A. 2A:53A-7(a) states that "[n]o nonprofit corporation . . . *or its . . . volunteers* shall . . . be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation ...." Id. (emphasis added). Similarly, N.J.S.A. 2A:53A-7.1 provides, in pertinent part:

are inconsistent with this chapter, except that this chapter shall not preempt any State law that provides additional protection from liability relating to volunteers or to any category of volunteers in the performance of services for a nonprofit organization or governmental entity."). As is evident from the ensuing analysis, the NJCIA provides the same, if not greater, protection from liability than the VPA. Thus, I do not need to engage in a preemption analysis here.

> Notwithstanding any provisions of law to the contrary, no person who provides volunteer service or assistance for any nonprofit corporation, society or association . . . shall be liable in any action for damages as a result of his acts of commission or omission arising out of and in the course of his rendering the volunteer service or assistance.

> Nothing in this subsection shall be deemed to grant immunity to any person causing damage by his willful, wanton or grossly negligent act of commission or omission.

N.J.S.A. 2A:53A-7.1b.

Plaintiff has not presented any material facts to dispute that the physician volunteers worked for Parker Health, that Parker Health is a nonprofit corporation organized for charitable purposes, and that Parker Health was engaged in the conduct for which it was organized when Laura Lomando received allegedly negligent medical treatment. Neither has Plaintiff alleged or asserted that the volunteer physicians engaged in willful, wanton, or grossly negligent conduct or omissions. Hence it is question of law for the Court to decide, based on the record presented, whether Parker is a nonprofit organized for charitable purposes under the NJCIA. See Estate of Komninos v. Bancroft Neurohealth, Inc., 417 N.J.Super. 309 (App. Div. 2010).

Parker Health is clearly a nonprofit—it has obtained nonprofit status from the Internal Revenue Service, see Nicosia Decl., Exh. 2 (IRS Letter dated Jun. 23, 2009), and Parker's Certificate of Incorporation indicates that it was organized under the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 et seq. See Nicosia Decl., Exh. 1 (Certificate

of Amendment to the Certificate of Incorporation).  Whether Parker is a nonprofit organized for charitable purposes is a fact-specific inquiry that requires a more detailed analysis.  Parker v. St. Stephen's Urban Dev. Corp., 243 N.J.Super. 317, 325 (App. Div. 2009).

Charitable purpose has been defined by the New Jersey Supreme Court as "[a]n application of property for the benefit of an indefinite number of persons, [including] by relieving their bodies from disease, suffering and constraint ...."  Bieker v. Community House of Moorestown, 169 N.J. 167, 175 (2001).  Courts may look to a nonprofit's Articles of Incorporation and distributed literature to determine its purposes.  Id. at 43.  Here, a review of the such documents reveals that Parker was created to "operate as a free health care facility [for] Monmouth County residents who do not have medical insurance ...," see Parker Family Health Center, www.ParkerFamilyHealthCenter.org/aboutus.htm, and to "serve . . . the health and wellness needs of the immediate household families of the medically uninsured ...," Nicosia Decl., Exh. 1 ("Certificate of Incorporation").

New Jersey courts, further, consider the source of a nonprofit's funding in ascertaining whether the nonprofit is charitable in nature.  Purely publically funded entities are not charitable institutions entitled to immunity under the NJCIA.  Tonelli, 185 N.J. at 439-40.  Institutions that are primarily funded through private donations, by contrast, typically are deemed charitable institutions.  Id. at 440.

Entities that have mixed private and public elements must be "analyzed in light of the aims underlying charitable immunity." Id. So, according to the New Jersey Supreme Court's decision in O'Connell v. State, that a state college receives partial government funding will not preclude it from claiming charitable immunity. 171 N.J. 484 (2002). It is enough that a mixed entity also receives private contributions, and that the entity does not provide a service to which New Jersey citizens are entitled. Id.; O'Connell, 171 N.J. at 494-95; Parker v. St. Stephen's Urban Dev. Corp., 243 N.J.Super. 317, 327-28, 579 A.2d 360 (App.Div. 1990) cited with approval in O'Connell, 171 N.J. at 495 ("If a nonprofit corporation is performing a charitable service and is essentially supported through charitable contributions, the fact that it happens to receive some government support would not alter its nature as a charity for immunity purposes.").

Record evidence here demonstrates that Parker Health receives the lion share (approximately, 90%) of its fiscal support from private donations. See Nicosia Decl., Exh. 3 (IRS Form 990, Return of Organization Exempt from Income Tax, stating that Parker received $540,433 in private funds and $56,034 in government contributions). Like the state college in O'Connell, that Parker Health receives a small portion of government funding does not affect its entitlement to charitable immunity under New Jersey law. Moreover, Parker Health does not provide a service to which New Jersey residents are entitled. To the contrary, Parker Health seeks to aid uninsured persons that would otherwise find it

financially prohibitive to seek the health and wellness care that Parker Health provides. Therefore, I conclude that Parker Health is organized exclusively for charitable purposes. This result is consistent with the primary purposes of the NJCIA, which are " protecting private trust funds and contributions, encouraging altruistic activity and private philanthropy, and relieving the government of the obligation of providing beneficent services ...." Tonelli, 185 N.J. at 448.

As to the third charitable immunity criteria—that Parker Health "was promoting such objectives and purposes" at the time of the injury to plaintiff who was then a beneficiary of the charitable works—the record indicates that the volunteer physicians were pursuing the purpose of providing medical services to uninsured persons at the time of the challenged conduct and omissions.  In addition, Laura Lomando was a beneficiary of Parker Health's services. As noted by the Appellate Division in Johnson v. Mountainside Hosp., 239 N.J.Super. 312, 320 (App. Div. 1990), "[a]lthough reimbursed by insurance and government programs for the cost of its services, non-profit hospitals continue to perform a vital, benevolent social function, *and every user of such a hospital is a beneficiary of its works*." (emphasis added).  Just as a user of a nonprofit hospital is a beneficiary of that hospital's works, so too was Laura a beneficiary of Parker Health's medical services.

The United States argues that because Laura was a beneficiary, Plaintiff, as administrator of Laura's estate, is also a beneficiary under the NJCIA.  In support of this

argument, the United States cites <u>Bieker v. Comm'y House of Moorestown</u>, 169 N.J. 167, 180 (2001), <u>Anasiewicz v. Sacred Heart Church</u>, 74 N.J.Super. 532, 537-38 (App. Div. 1962), <u>Pomeroy v. Little League Baseball</u>, 142 N.J.Super. 471, 474  (App. Div. 1976), and <u>Boeckel v. Orange Mem. Hosp.</u>, 108 N.J.L. 453, 456 (Sup. Ct. 1932).  It is not clear from New Jersey case law that the defendant named in a wrongful death suit must demonstrate the beneficiary status of the suing Plaintiff.  In <u>Bieker</u>, the New Jersey Supreme Court addressed whether an injured child was a beneficiary of the defendant-gymnasium in a suit brought by his parents as his guardians ad litem, as well as in their individual capacities. Moreover, in <u>Johnson</u>, <u>supra</u>, when faced with a challenge to a hospital's right to charitable immunity in a suit brought by the decedent-patient's husband, the Appellate Division focused solely upon whether the decedent-patient was a beneficiary of the hospital's services.

In any event, the United States also argues that Plaintiff was a beneficiary of Parker Health in that she was relieved of the financial obligation to pay for her daughter's medical care because Laura's application for medical care indicates that she was supported financially by Plaintiff.  Thus, to the extent New Jersey law requires a nonprofit corporation to assert a separate beneficiary status for an administrator in a wrongful death suit, the Court finds Parker Health has demonstrated that Plaintiff was also a beneficiary of its services.

Because the three criteria for NJCIA protection are met, Parker Health is entitled to charitable immunity under the statute.  With respect to immunity for the physician volunteers, the plain language of the statute, namely, N.J.S.A. 2A:53A-7 and 2A:53A-7.1, clearly encompasses all sorts of volunteers, including health care professionals.  The latter states, without exception, that "*no person* who provides volunteer service . . . shall be liable ..." for his or her negligent acts.  Id. (emphasis added).  This reading is confirmed by N.J.S.A. 2A:53A-7, which further provides that volunteers are immune from suit and that only "compensated" health care providers are not entitled to immunity.[8]

Accordingly, for the foregoing reasons, I conclude that both the physician volunteers and Parker Health are entitled to immunity under the NJCIA.  Because both are entitled to immunity, so too is the United States pursuant to 28 U.S.C. § 2674.  As noted, section 2674 permits the United States to assert immunities available under state law.[9]  Thus, based

---

[8]  "Nothing in this subsection shall be deemed to grant immunity to any health care provider, in the practice of his profession, who is a compensated employee, agent or servant of any nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes."  N.J.S.A. 2A:53A-7a.  There is language in N.J.S.A. 2A:53A-7b that denies immunity to hospital volunteers, but Plaintiff has not argued that Parker Family Health Center is a hospital.  See also N.J.S.A. 2A:53A-8 (adopting a partial grant of immunity to nonprofits organized for hospital purposes).  Indeed, the record suggests that Parker is not a hospital because Parker did not have the capability to perform the biopsy ordered for Laura Lomando, and further, no party has argued to the contrary.  See Expert Report of Dr. Mark Fialk, Dallavalle Cert., Exh. C at 4, 9.

[9]  While I do not decide, in my discussion of section 2674 *infra,* whether section 2674 permits the United States to assert immunities available to individual employees in

21

on the NJCIA, the Court grants the United States' motion for summary judgment.

### 3.      Volunteer Protection Act

As noted, the United States further argues that it is entitled to immunity under the VPA. The VPA grants immunity to volunteers of nonprofit organizations or governmental entities from suits seeking monetary relief for negligent acts committed while acting within the scope of their volunteer responsibilities.   42 U.S.C. § 14503(a)(1).   The rationale underlying the VPA is to encourage volunteerism.   <u>Armendarez v. Glendale Youth Center, Inc.</u>, 265 F.Supp.2d 1136, 1140 (D.Ariz. 2003).   At least one court has held that the VPA preempts both federal and state law such that any claim against a volunteer must be dismissed on immunity grounds.   <u>Id.</u> at 1141.   Notably, however, the VPA explicitly limits its application to individual volunteers.   It denies immunity to nonprofit organizations and government entities.   42 U.S.C. § 14053(c) ("Nothing in this section shall be construed to affect the liability of any nonprofit organization or governmental entity with respect to harm caused to any person.").

---

connection with a Volunteer Protection Act claim, the plain language of the section states that the United States "shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the *employee* of the United States whose act or omission gave rise to the claim."   28 U.S.C. § 2674 (emphasis added).   Even assuming for the sake of argument that the United States should only be able to assert employer-based defenses under the VPA, as Plaintiff argues, NJCIA immunity attaches to both the "employing" non-profit entity and the volunteer physician.   Thus, whether or not plaintiff's argument has merit in the VPA context, the United States is entitled to assert immunity under the NJCIA.

As suggested *infra*, the law relating to whether 28 U.S.C. § 2674 permits the United States to assert immunities available only to its employees is scant and muddled. Moreover, this Court's research has not revealed any controlling case law addressing the relationship between the FTCA and the VPA. If the United States is not entitled under § 2674 to assert immunities available to the volunteer physicians, but is entitled only to assert immunities available to private employers, there is an argument that the United States is *not* entitled to immunity under the Volunteer Protection Act because subsection 14503(c) of the VPA explicitly excepts employers (*i.e.*, nonprofit organizations and governmental entities) from its grant of immunity. I need not rule on the applicability of the VPA in this case, however, because the United States is clearly entitled to immunity under the NJCIA.

### C.    ER Defendants' Motion for Summary Judgment

The ER Defendants, Drs. Reynolds, Talbert, and Emergency Physician Associates of North Jersey, P.C., move for summary judgment on Plaintiff's malpractice and wrongful death claims.[10] As noted, Plaintiff alleges that these defendants failed to exercise due care in treating Laura Lomando in the emergency department at the Riverview Medical Center

---

[10]    The Court notes at the outset that Plaintiff has made no specific allegations or argument directed at the Emergency Physicians Associates of North Jersey, P.C., apart from those directed at the individual doctors who are members of that group. Thus, the Court treats all arguments applicable to the doctors as equally applicable to the group. Furthermore, Plaintiff has not named the physician assistant, Theresa Biedenbach, P.A., as a defendant in this action. Accordingly, the Court will not consider the treatment provided by Ms. Biendenbach in connection with the ER Defendants' motion.

on September 5, 2006, September 15, 2006 and September 20, 2006.

The ER Defendants assert that Plaintiff has not presented sufficient expert testimony to proceed to trial on their claims.  Both Dr. Reynolds and Dr. Talbert specialize, and are board-certified, in emergency medicine.  Neither of Plaintiff's experts, Drs. Fialt and Hayes, are specialists in this field.  In the ER Defendants' view, Plaintiff's experts may not testify because they do not comply with N.J.S.A. 2A:53A-41(a)'s specialist requirement, and because their expert reports contain inadmissible net opinions.  For the following reasons, the Court agrees with these defendants that Plaintiff's experts do not satisfy the strictures of N.J.S.A. 2A:53A-41.  Having reached that conclusion, the Court need not address the net opinion argument.[11]

N.J.S.A. 2A:53A-41 mandates that a person may not give expert testimony, in a medical malpractice action, against a specialist recognized by the American Board of Medical Specialties ("ABEM"), whose care or treatment involved that specialty, unless the expert is credentialed in the same specialty:

> [I]f the person against whom or on whose behalf the testimony
> is being offered is board certified and the care or treatment at
> issue involves that board specialty or subspecialty recognized

---

[11]    The Court notes, in this connection, Plaintiff's statement in her opposition brief that she is not relying on Dr. Hayes' opinion in connection with the net opinion aspect of the ER Defendants' motion.  It is not clear from Plaintiff's opposition whether Plaintiff intended that concession to apply to that aspect of the ER Defendants' motion based on N.J.S.A. 2A:53A-41.  Since N.J.S.A. 2A:53A-41 applies equally to Plaintiff's experts, the Court refers to both experts in its analysis of the statute.

by the American Board of Medical Specialties . . . the expert witness shall be:

(1) a physician credentialed by a hospital to treat patients for the medical condition, or to perform the procedure, that is the basis for the claim or action; or

(2) a specialist or subspecialist recognized by the American Board of Medical Specialties . . . who is board certified in the same specialty . . . and during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to either:

(a) . . . the active clinical practice of that specialty . . .; or

(b) the instruction of students in . . . an accredited medical school, health professional school or accredited residency or clinical research program in the same specialty . . . recognized by the American Board of Medical Specialties or the American Osteopathic Association; or

(c) both.

N.J.S.A. 2A:53A-41(a).

Subsection (b) of the statute addresses testimony offered against general practitioners.  That subsection directs that an expert witness

during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to:

(1) active clinical practice as a general practitioner; or active clinical practice that encompasses the medical condition, or that includes performance of the procedure, that is the basis of the claim or action; or

> (2) the instruction of students in an accredited medical school, health professional school, or accredited residency or clinical research program in the same health care profession in which the party against whom or on whose behalf the testimony is licensed; or
>
> (3) both.

N.J.S.A. 2A:53A-41(b).

Plaintiff does not contend that her experts are credentialed in emergency medicine. Rather, she argues that Drs. Reynolds' and Talbert's care and treatment did not involve their board-specialty in emergency medicine. Thus, according to Plaintiff, N.J.S.A. 2A:53A-41(a) does not bar her experts from testifying.

Plaintiff makes specific arguments with respect to each date of service at the Riverview Medical Center emergency room. In regards to the September 5, 2006 visit, Laura Lomando complained of chest tightness, nausea, diarrhea, and chest pain. During the visit, Dr. Reynolds became aware that Laura's left lymph node was swollen. Plaintiff argues that Dr. Reynolds failed to properly diagnose cancer as the cause of the lymph node swelling and that, this sort of diagnosis falls under the skill and knowledge of a general practitioner. With respect to September 15, 2006, Plaintiff argues that, while Laura Lomando presented with symptoms of fever, swelling, and nausea, Dr. Talbert improperly diagnosed Laura with an infection in her lymph nodes, among other diagnoses, and failed to include cancer as a possible diagnosis. Finally, with respect to September 20, 2006,

Plaintiff argues that Dr. Reynolds failed to more aggressively treat the effects of Laura Lomando's spontaneous tumor lysis syndrome.  On that date, Plaintiff argues, Dr. Reynolds merely ordered tests for the Laura and admitted her to the hospital.  Plaintiff contends that the ordering of diagnostic tests does not involve Dr. Reynold's emergency medicine specialty.

The New Jersey Supreme Court has yet to interpret the language in N.J.S.A. 53:A-41(a) that "the care or treatment at issue involves [the] specialty" of the specialist against whom expert testimony is offered.[12]  However, a plain reading of the statute makes the Court's determination straightforward in this case.  See Ryan v. Renny, 203 N.J. 37, 54 (2010) (relying on the plain language of N.J.S.A. 53:A-41 in interpreting subsection (c) of the statute).

As Plaintiff acknowledges, emergency medicine is a physician specialty recognized by the American Board of Medical Specialties ("ABMS").  Thus, the plain language of N.J.S.A. 53:A-41(a) indicates that it applies here. The ABMS defines the speciality of emergency medicine as

> the immediate decision making and action necessary to prevent death or any further disability both in the pre-hospital setting by directing emergency medical technicians and in the emergency department.  This special[ty involves] immediate

---

[12]    The New Jersey Supreme Court recently heard argument in a case that raises the question of how to interpret this language, Buck v. Henry, Slip Op., Docket No. A-0362-09T1 (App. Div. 2010).

>recognition, evaluation, care, stabilization and disposition of a
>generally diversified population of adult and pediatric patients
>in response to acute illness and injury.

Sarroll Cert., ¶ 19, Exh. P.  Similarly, ABEM, a medical certification board recognized by

the ABMS, defines the tools that emergency physicians must possess: "(1) an assessment

of patient acuity; (2) a description of the tasks that must be performed to provide

appropriate emergency medical care; and (3) a listing of common conditions, symptoms,

and disease presentations." See American Board of Emergency Medicine, The Model of the

Clinical Practice of Emergency Medicine,  http://www.abem.org/public/portal/alias__

Rainbow/lang__en-US/tabID__3590/DesktopDefault.aspx at 2 (discussing 2007 and 2005

models).

　　　What distinguishes emergency medicine from other specialities, according to the

ABEM, is that "an emergency physician's approach to patient care begins with the

recognition of patterns in the patient's presentation that points to a specific diagnosis or

diagnoses.  *Pattern recognition is both the hallmark and cornerstone of the clinical practice of*

*Emergency Medicine*, guiding the diagnostic tests and therapeutic interventions during the

entire patient encounter." Id. at 3. (emphasis added).[13]

---

[13]　　　The Court takes judicial notice of the ABEM's definitions of emergency
medicine found in its publications, pursuant to New Jersey Rule of Evidence 201(b), which
permits courts to take notice of "specific facts and propositions of generalized knowledge
which are capable of immediate determination by resort to sources whose accuracy cannot
reasonably be questioned."  The ABEM is a member of ABMS, and its publication are
readily available to the public via its website.  Thus, the Court finds reference to its

I disagree with Plaintiff's contention that Drs. Reynolds' and Talbert's care did not involve the practice of emergency medicine. The ABMS definition of emergency medicine is that it involves the "immediate recognition, evaluation, care, stabilization and disposition" of patients in an emergency room setting. Moreover, the ABEM definition states that emergency physicians are especially trained in pattern recognition and responsible for choosing the appropriate diagnostic testing and interventions to be taken. Here, Drs. Reynolds and Talbert's treatment of Laura in the Riverview Medical Center emergency room fell squarely within these definitions. On the September 5 and September 15 dates of service, Plaintiff specifically asserts that the respective doctors failed to appreciate the the patterns present in her symptoms that would suggest cancer as a possible diagnosis. This is precisely what emergency physicians, particularly in an emergency room setting, are trained to do. With respect to Plaintiff's argument that the ordering of diagnostic tests on September 20, 2006 did not involve Dr. Reynolds' specialized training in emergency medicine, the ABEM definition makes clear that emergency physicians are particularly trained to determine which diagnostic tests are required by recognizing patterns in the patient's presentation that point to a specific

---

publications proper under Rule 201(b). Cf. Lindquist v. City of Jersey City Fire Dept., 175 N.J. 244, 273 (2003) (taking judicial notice of medical causation studies that Court found through its own research).

diagnosis.

Plaintiff's citations to Jorden v. Glass, Civil No. 09-1715, 2010 WL 786533 (D.N.J. Mar. 5, 2010), Harbeson v. Underwood-Memorial Hosp., Docket No. L-707-07, 2009 WL 1766598 (N.J. Super. App. Div. Jun. 24, 2009), and Estate of Harrington v. Tsai, Docket No. L-0242-05, 2007 WL 987158 (N .J.Super. App. Div. April 4, 2007), are unhelpful to her.  In Jordan, the court held that a psychiatrist who treated a patient's chest pains while that patient was participating in a clinical trial did not provide care that involved the specialty of pyschiatry.  Instead, the Court concluded, "plaintiff's malpractice allegation, that the decedent's chest pains were not properly treated, fall under the general skill and knowledge of a general practitioner."  2010 WL 786533 at *4.  Similarly, in Harbeson, the court concluded that a "board certified anesthesiologist was not acting in his capacity as a specialist when he allegedly administered an antibiotic to guard against infection."  Jorden, 2010 WL 786533 at *3 (discussing Harbeson).  Here, in contrast to the facts of both Jorden and Harbeson, Plaintiff's allegations relate specifically to the care offered by emergency physicians, in an emergency room setting, as that specialty has been defined by the ABMS.  Finally, Plaintiff's citation to Tsai is inapt because, as Defendants correctly argue, that decision did not apply N.J.S.A. 2A:53A-41 but applied its predecessor, N.J.S.A. 2A:53A-27.  See 2007 WL 987158 at *4.

My ruling is buttressed by the policy underlying N.J.S.A. 2A:53A-41.  In enacting the

statute in 2004, the New Jersey legislature specifically referenced, and intended to provide relief to, emergency medicine physicians from certain malpractice claims.  The statute was enacted to help decrease the number of unsustainable claims brought and prosecuted against medical specialists only to be dismissed later in the proceedings.  New Jersey State Bar Ass'n v. State, 382 N.J.Super. 284, 300 (Ch. Div. 2005).  In New Jersey State Bar Ass'n v. State, a New Jersey court quotes from a hearing, at which this issue was discussed, which quote was taken into account by the legislature in enacting N.J.S.A. 2A:53A-41:

> By now, we more fully understand the scope of this developing problem, *especially as it pertains to specialties such as* OB/GYN, *emergency medicine*, and surgery, and the surgical subspecialties. Even more disconcerting is the evidence that physicians in other specialties report high double-digit premium increases and fewer companies willing to write coverage. As the problem has grown, physicians and the entire New Jersey medical community have entered into a full-fledged state of crisis. When that happens, patients are in crisis.

382 N.J.Super. at 300 (emphasis added).

Finally, even assuming that Plaintiff were correct in asserting that Drs. Reynolds and Talbert provided care and treatment that could have been provided by a general practitioner, Plaintiff would have to demonstrate that her experts satisfy the criteria set forth in N.J.S.A. 2A:53A-41(b).  Harbeson, 2009 WL 1766598 at *8.[14]  As noted *supra*, that

---

[14]     While this unpublished decision is non-binding, see N.J.R. 1:36-3, the court relies upon its reasoning as persuasive authority.  Falcon v. American Cyanamid, 221 N.J. Super. 252, 261 n.2 (App. Div. 1987); James Const. Co., Inc. v. Director, Div. of Taxation, 18

subsection applies to expert testimony presented against general practitioners.  Plaintiff has not made any showing here that her experts satisfy N.J.S.A. 2A:53A-41(b).

Because Plaintiff's experts may not testify against Drs. Reynolds and Talbert, Plaintiff has failed to produce any admissible expert testimony in support of her *prima facie* case of malpractice.  Gardner, 150 N.J. at 376; Gonzalez, 407 N.J.Super. at 587.  The same holds true for Plaintiff's wrongful death claim.  Phillips, 190 N.J. at 591.  Accordingly, her claims against these doctors must be dismissed.  See Rosenberg v. Tavorath, 352 N.J.Super. 385, 399 (App. Div. 2002) ("Absent competent expert proof of [the prima facie malpractice] elements, the case is not sufficient for determination by the jury.") (citing Sanzari v. Rosenfeld, 34 N.J. 128, 134-35 (1961)).  With respect to Defendant Emergency Physician Associates of North Jersey, P.C., because Plaintiff has not presented any expert testimony against that practice group, it must also be dismissed.  Accordingly, the ER Defendants' motion for summary judgment is granted.

### D.   Dr. Hyppolite

Having granted all other defendants' motions for summary judgment, the only remaining defendant is Dr. Hyppolite.  This suit was initially filed pursuant to this Court's federal question jurisdiction under the FTCA.  Now that the Court has granted the United States' motion for summary judgment, there is no longer federal jurisdiction over the suit.

---

N.J. Tax 224, 229 n.1 (1999).

Plaintiff has not asserted any basis for diversity jurisdiction with respect to Plaintiff's remaining claim against Dr. Hyppolite; it appears that both Dr. Hyppolite and Plaintiff are New Jersey residents.  The Court of Appeals for the Third Circuit has held that, where all federal claims are dismissed before trial, "the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (citations omitted).  As no such extraordinary circumstances appear to be present, and no pending motion by Dr. Hyppolite, this Court declines to exercise supplemental jurisdiction over the state-law claims against him.  See 28 U.S.C. § 1367 (c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . .  if . . .  the district court has dismissed all claims over which it has original jurisdiction.").  Accordingly, the Court dismisses the suit and, pursuant to 28 U.S.C. § 1367(d), Plaintiff may refile her claim against Dr. Hyppolite in state court within 30 days, during which time frame the statute of limitation is tolled.

## IV.     CONCLUSION

For the foregoing reasons, the Court grants Riverview Medical Center's, the United States', and the ER Defendants' motions for summary judgment.

Dated: March 18, 2011                                    /s/ Freda Wolfson
                                                        Honorable Freda L. Wolfson
                                                        United States District Judge

33